*Maryland Board of Physicians, et al. v. Mark R. Geier, et al.*, No. 1979, Sept. Term 2017, and No. 338, Sept. Term 2018. Opinion by Arthur, J.

**APPELLATE PROCEDURE—SEPARATE DOCUMENT REQUIREMENT**

Under a mechanical application of Md. Rule 2-601, the circuit court's 112-page memorandum opinion purporting to award damages to three plaintiffs did not set forth a final judgment. The court did not set forth a final judgment on a separate document within the meaning of Rule 2-601(a) until the court issued a subsequent order stating each defendant's liability for damages and directing the clerk to enter a final judgment.

**FEDERAL CIVIL RIGHTS CLAIMS—LIABILITY OF STATE AGENCY**

42 U.S.C. § 1983 does not authorize an action for damages against a state or a state agency. The Board of Physicians had no liability for damages under 42 U.S.C. § 1983, where the complaint did not name the Board as a defendant in the § 1983 count, but instead named the Board as a defendant only in a separate tort count. Because the Board had no § 1983 liability, the Board could not be required to pay an award of attorneys' fees under 42 U.S.C. § 1988.

**FEDERAL CIVIL RIGHTS CLAIMS—ABSOLUTE QUASI-JUDICIAL IMMUNITY**

Under federal law, government officials who perform adjudicative or prosecutorial functions in administrative proceedings have absolute immunity from being sued for damages under 42 U.S.C. § 1983, as long as those proceedings afford procedural safeguards adequate to restrain unconstitutional conduct by agency officials.

In this case, members and staff of the State Board of Physicians were entitled to absolute immunity in an action under 42 U.S.C. § 1983 to recover damages resulting from their participation in the adjudicative function of issuing a cease-and-desist order. The administrative prosecutor who drafted the order was also entitled to absolute immunity, because she acted as an advocate for the State in asking the Board to include provisions in the order.

**MARYLAND TORT CLAIMS—ABSOLUTE QUASI-JUDICIAL IMMUNITY**

As a matter of first impression, under Maryland common law, agency officials who perform either adjudicative or prosecutorial functions in administrative proceedings are absolutely immune from suit for non-constitutional tort claims based on conduct for which those officials would enjoy absolute immunity under federal law in a suit for damages for alleged violations of the federal constitution.

**STATUTORY INTERPETATION—PRESUMPTION AGAINST PREEMPTION OF COMMON LAW**

Section 5-715(b) of the Courts and Judicial Proceedings Article provides that a member or legally authorized agent of the State Board of Physicians "who acts without malice … is not civilly liable for … acting on an allegation for Board action made to the Board[.]" Absent an express statement or clear implication of legislative intent to preempt the common law, this statute must be interpreted as neither changing nor limiting other defenses that might be available under common law.

**CIVIL PROCEDURE—ABSOLUTE IMMUNITY**

The defense of absolute immunity may be raised in a preliminary motion to dismiss or in a motion for summary judgment. An interlocutory order overruling a claim of absolute immunity is subject to de novo review on appeal from an adverse final judgment. If the circuit court erroneously rejected a valid claim of absolute immunity, the appellate court should reverse the judgment with the direction to dismiss the action.

**DISCOVERY—SANCTIONS AGAINST MULTIPLE DEFENDANTS**

A decision to impose sanctions based on a defendant's discovery failure, without more, does not justify the imposition of sanctions against a co-defendant. In this case, the circuit court abused its discretion by imposing a default as to the liability of 25 individual defendants as a sanction for discovery failures attributed to their co-defendant, the State Board of Physicians. The court further erred when it refused to vacate the default as to those defendants, based on the court's clearly erroneous finding that those defendants previously waived their objection to being sanctioned for the Board's discovery failures.

**MARYLAND TORT CLAIMS—LIABILITY OF STATE AGENCY**

In an action where all officials of a state agency have absolute immunity, the agency cannot be made liable for the conduct of those officials under the Maryland Tort Claims Act. Where the conduct of the agency officials is the only basis for liability of the agency, a judgment in favor of all of the agency officials inures to the benefit of the agency even if the agency is in default.

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1979
September Term, 2017

No. 338
September Term, 2018

_____

CONSOLIDATED CASES

_____

MARYLAND BOARD OF PHYSICIANS,
ET AL.

v.

MARK R. GEIER, ET AL.

_____

Arthur,
Leahy,
Reed,

JJ.*

_____

Opinion by Arthur, J.

_____

Filed: June 26, 2019

*Chief Judge Matthew J. Fader, Judge Donald
E. Beachley, and Judge Steven B. Gould did not
participate in the Court's decision to designate
this opinion for publication pursuant to Md.
Rule 8-605.1

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

# TABLE OF CONTENTS

**Statutory and Regulatory Background** ............................................................. 1

    A.    The Maryland State Board of Physicians and Board Personnel ........................ 2

    B.    General Procedures for the Board's Medical Disciplinary Proceedings ............ 5

**The Administrative Proceedings** ..................................................................... 7

    A.    The Initial Medical Disciplinary Proceedings Against the Geiers ..................... 7

    B.    The Cease-and-Desist Order Dated January 25, 2012 ........................................ 9

    C.    The Amended Cease-and-Desist Order Dated February 22, 2012 ................... 10

    D.    Outcome of the Medical Disciplinary Proceedings .......................................... 12

**The Proceedings in the Circuit Court** ........................................................... 14

    A.    The Geiers' Action Against Board Personnel and the Board ........................... 14

    B.    Denial of Motion to Dismiss on the Ground of Absolute Immunity ............... 16

    C.    Grant of Motions to Compel Discovery and for Discovery Sanctions ............. 18

    D.    The First Interlocutory Appellate Decision on Discovery Matters ................. 20

    E.    Rejection of Absolute Immunity and Other Rulings on Remand .................... 21

    F.    The Second Interlocutory Appellate Decision on Discovery Matters .............. 23

    G.    Remaining Pretrial Rulings ............................................................................... 24

    H.    Bench Trial on Damages ................................................................................... 26

    I.    Opinion Awarding Compensatory and Punitive Damages ................................ 28

    J.    Award of Attorneys' Fees and Entry of Final Judgment ................................... 32

**Scope of Appellate Review** ............................................................................. 34

**Questions Presented** ...............................................................................................38

**Discussion** ...............................................................................................................40

    I.    Liability of the State Board of Physicians Under 42 U.S.C. § 1983 ......................40

    II.   Claim Against Board Personnel Under 42 U.S.C. § 1983 ...................................44

        A.    Absolute Judicial and Prosecutorial Immunity in § 1983 Actions ..................44

        B.    Absolute Immunity in the Context of Administrative Proceedings .................47

        C.    Absolute Immunity in Relation to Medical Disciplinary Proceedings.............50

        D.    Absolute Immunity for Medical Disciplinary Proceedings in Maryland .........53

        E.    Absolute Immunity for the Issuance of a Cease-and-Desist Order ..................57

        F.    Absolute Immunity of Others Participating in the Board's Decision ..............63

    III.   Maryland Tort Claim Against Board Personnel and the Board...........................65

        A.    Absolute Judicial (and Quasi-Judicial) Privilege Under Maryland Law .........65

        B.    Absolute Immunity for Government Officials Under Maryland Law .............71

        C.    Qualified Immunity for Board Personnel Under Maryland Statutes................82

    IV.   Absolute Immunity in the Procedural Context of this Case ................................91

        A.    Denials of Motion to Dismiss and Motion for Summary Judgment ...............91

        B.    Refusal to Consider Absolute Immunity After Default as to Liability ............97

**Conclusion** ..............................................................................................................108

In 2012, the Maryland Board of Physicians issued a public cease-and-desist order against Mark Geier, M.D.  The text of the order included information about medications prescribed to Dr. Geier, his wife, and his son.  The Geiers filed suit in the Circuit Court for Montgomery County, seeking to recover damages from 25 persons who were alleged to have participated in the drafting or approval of the order and from the Board itself.  The court rejected the defendants' assertions that they were entitled to absolute immunity with respect to their functions in the administrative proceedings.

The defendants managed to narrow the discovery of some matters by prevailing in two interlocutory appeals: *Maryland Board of Physicians v. Geier* ("*Geier I*"), 225 Md. App. 114 (2015), and *Maryland Board of Physicians v. Geier* ("*Geier II*"), 451 Md. 526 (2017).  Ultimately, as a sanction for the Board's discovery failures, the circuit court ordered a default as to the liability of all defendants.  After a bench trial on damages, the court awarded a total of $1.25 million in compensatory damages and a total of $1.25 million in punitive damages.  The court further ordered the defendants to pay nearly $2.4 million in attorneys' fees.  All defendants appealed from the final judgment.

Foremost in a litany of challenges, the defendants contend that they are entitled to absolute immunity as to all claims.  For the reasons discussed in this opinion, we conclude that their contention is correct.  The judgment shall be reversed.

### STATUTORY AND REGULATORY BACKGROUND

The defendants in this case are appealing from a civil judgment for damages based on actions that occurred in the context of medical disciplinary proceedings.  To understand the issues presented, it is necessary to begin with some understanding of the

statutes and regulations that governed those proceedings.

**A.      The Maryland State Board of Physicians and Board Personnel**

In Maryland, health occupations are "regulated and controlled" to "protect the health, safety, and welfare of the public." Md. Code (1981, 2014 Repl. Vol., 2018 Supp.), § 1-102(a) of the Health Occupations Article. The General Assembly has created independent health occupations boards, the majority of whose members are licensed to practice in the regulated occupation, "with the intent that a peer group is best qualified to regulate, control, and otherwise discipline in a fair and unbiased manner the licensees . . . who practice in the State." *Id.* § 1-102(b). The State Board of Physicians is one such board within the Department of Health (*id.* § 14-201), one of the principal departments of the executive branch of the State government. *See* Md. Code (1984, 2014 Repl. Vol., 2018 Supp.), § 8-201(b)(8) of the State Government Article.

The Board is responsible for administering the Maryland Medical Practice Act, codified at Title 14 of the Health Occupations Article. Many of the Board's proceedings are governed by the Contested Cases subtitle of the Administrative Procedure Act: Subtitle 2 of Title 10 of the State Government Article. Regulations for the Board's disciplinary and licensing matters are codified at Title 10, Subtitle 32, Chapter 2, of the Code of Maryland Regulations. Because the underlying events occurred in 2011 and 2012, our analysis concerns the provisions in effect at that time. Unless otherwise specified, subsequent citations to "HO" refer to the 2009 Replacement Volume and 2011 Supplement of the Health Occupations Article; citations to "SG" refer to the 2009 Replacement Volume and 2011 Supplement of the State Government Article; and

2

citations to "COMAR" refer to the 2011 version of the Code of Maryland Regulations.[1]

Under the Medical Practice Act, any person who practices medicine in Maryland must be licensed by the State Board of Physicians. *See* HO §§ 14-301, 14-601. The Act expressly empowered the Board to adopt rules and regulations to carry out the provisions of the Act (HO § 14-205(a)(1)(i)(1)); to investigate alleged violations of the Act (HO § 14-205(a)(2)); to reprimand a licensee, place any licensee on probation, or suspend or revoke a license upon a determination that the licensee engaged in conduct prohibited by the Act (HO § 14-404(a)); to impose fines instead of or in addition to other sanctions (HO § 14-405.1(a)); to issue a cease-and-desist order or obtain injunctive relief for practicing medicine without a license (HO § 14-206(e)); and to levy fines for practicing medicine without a license (HO § 14-606(a)(4)(ii)).

Before 2013, the Board consisted of 21 members appointed by the Governor with the advice of the Secretary of the Department[2] and with the advice and consent of the Senate. HO § 14-202(a)(1). Those members included: 13 practicing licensed physicians, including one doctor of osteopathy and one representative of an academic medical institution; one representative of the Department; one certified physician assistant; five "consumer members"; and one "public member knowledgeable in risk management or quality assurance matters[.]" HO § 14-202(a)(2)(i)-(vii). The "consumer" and "public"

---

[1] In the intervening years, both the Medical Practice Act and the Board's regulations have undergone substantial revisions.

[2] In 2017, the General Assembly renamed the Department of Health and Mental Hygiene as the Department of Health. *See* 2017 Md. Laws ch. 214.

members are persons who have never trained to become a physician and who maintain limited personal and financial ties to the field of medicine. *See* HO § 14-202(b). Members serve four-year terms (HO § 14-202(i)), during which they may be removed for cause (*see* HO § 14-202(k)). The Governor appoints one chair of the Board, who serves a two-year term. HO § 14-203(a).

Board members are entitled to compensation in accordance with the State budget. HO § 14-204(c). In practice, however, because most members are practicing physicians, they make limited time commitments to the Board's activities, for which they receive modest compensation. According to a notice soliciting nominations to fill vacancies in 2012, Board members attend one full-day meeting each month (along with their service on one or more committees), and for their attendance they receive complimentary lunch, travel reimbursement, and a $250 per diem (or a $300 per diem for the chair).[3]

To assist the Board with its many duties, the Secretary employs a full-time staff headed by an executive director. *See* HO § 14-204(d). Assistant attorneys general, investigators, and hearing officers assist with "the investigation, development, and prosecution of cases referred to the Board[.]" HO § 14-204(e). Attorneys assigned to prosecute administrative charges are known as administrative prosecutors. COMAR 10.32.02.02(B)(3). Attorneys assigned for the purpose of giving advice on legal matters before the Board are known as Board counsel. COMAR 10.32.02.02(B)(6).[4]

---

[3] MARYLAND DEPARTMENT OF HEALTH, CURRENT RECRUITMENTS: BOARD OF PHYSICIANS, https://perma.cc/MH47-QTWM.

[4] To maintain separation of these functions, guidelines from the Office of the

**B.**       **General Procedures for the Board's Medical Disciplinary Proceedings**

When the Board receives an allegation of grounds for disciplinary action, the

Board's staff undertakes an investigation.  HO § 14-401(a); COMAR 10.32.02.03(A).

The Board investigates and adjudicates allegations of the unlicensed practice of medicine

under the same process that it uses for disciplinary actions against licensed physicians.

*See* COMAR 10.32.02.06(B)(1).  In connection with an investigation, the Board may

issue subpoenas under the authorization of one of the Board's officers or directors.  HO

§§ 14-206(a), 14-401(i).  If the allegations concern the failure to meet the appropriate

standard of care, the Board must refer the matter to the Medical and Chirurgical Faculty

of Maryland, a non-profit organization, for peer review by physicians in the relevant

medical specialty.  HO § 14-401(c)(2); COMAR 10.32.02.03(B).

Based on its review of investigation reports, the Board may "[t]ake any

appropriate and immediate action" (HO § 14-401(c)(1)(ii)), such as issuing a cease-and-

desist order or issuing formal charges for violation of the Medical Practice Act.  *See*

COMAR 10.32.02.03(C)(1).  After service of charges (COMAR 10.32.02.03(C)(5)), the

---

Attorney General prohibit ex parte communications between the attorneys who serve as
"advocates" in agency proceedings and the attorneys who serve as "advisors" to the
agency; and further require those attorneys to keep separate files.  *See* Office of Attorney
General, Guidelines for Administrative Adjudicatory Proceedings (Oct. 27, 1994),
*available at* https://web.archive.org/web/20150907151423/http://www.mbp.state.md.us/
forms/ag_guidelines.pdf.  The combination of investigative and adjudicatory functions in
the same agency does not violate due process if the investigators do not participate in the
adjudication, and the adjudicators do not participate in the investigation.  *Consumer
Protection Div., Office of the Att'y Gen. v. Consumer Publishing Co.*, 304 Md. 731, 763
(1985); *see also State Bd. of Physicians v. Bernstein*, 167 Md. App. 714, 766-67 (2006)
(rejecting an argument that the combination of prosecutorial and adjudicative functions in
the State Board of Physicians was, in itself, a violation of due process).

respondent may request an evidentiary hearing conducted by an administrative law judge from the Office of Administrative Hearings. HO § 14-405(b)(1); COMAR 10.32.02.03(E)(1). The respondent has the right to be represented by counsel at the hearing (HO § 14-405(c)) and at any other stage in the proceedings (COMAR 13.32.02.03(D)(1)). Each party is entitled to call witnesses, offer evidence, cross-examine witnesses, and make arguments. SG § 10-213(f); COMAR 28.02.01.20(A)(1).

Following the hearing, the administrative law judge refers proposed findings of fact, proposed conclusions of law, and any proposed disposition to the Board. HO § 14-405(e); COMAR 10.32.02.03(E)(10). If either party files exceptions, the Board holds an exceptions hearing before it issues its own findings of fact, conclusions of law, and disposition. COMAR 10.32.02.03(F)(2). The Board's final decision is subject to judicial review in the circuit court. *See* HO § 14-408(b); COMAR 10.32.02.03(H). The circuit court's judgment is subject to appellate review. *See* SG § 10-223(b).

Ordinarily, the Board must give notice and the opportunity for a hearing in accordance with the Administrative Procedure Act before it suspends or revokes a physician's license. HO § 14-405(a); *see* SG § 10-226(c)(1). The Board has limited authority to "order summarily the suspension of a license" as an "emergency action," and then it must provide notice and the opportunity for a hearing "promptly" thereafter. SG § 10-226(c)(2); *see* COMAR 10.32.02.05. After being suspended summarily, the licensee may demand a full evidentiary hearing. COMAR 10.32.02.05(I).

This regulatory scheme includes provisions to maintain confidentiality for the Board's proceedings, while also ensuring public access to information about the licensing

6

and discipline of physicians. "Except as otherwise expressly provided" in the Act, "the Board or any of its investigatory bodies may not disclose any information contained in a record" of its proceedings. HO § 14-411(b); *see also* COMAR 10.32.02.08(A) ("[e]xcept for formal charging documents, notices of intent to deny [licensure], or as otherwise provided by law, the proceedings of the Board are confidential"). Upon a request under the Public Information Act, a custodian of records must permit inspection of "any orders and findings that result from formal disciplinary actions" against a licensee. SG § 10-617(h)(2)(vi). Furthermore, the Board must "create and maintain a public individual profile on each licensee" that must include a "description of any disciplinary action taken by the Board against the licensee within the most recent 10-year period that includes a copy of the public order[.]" HO § 14-411.1(b)(1). The Board is required to "maintain a website that serves as a single point of entry where all physician profile information is available to the public on the Internet[.]" HO § 14-411.1(d)(2).

**THE ADMINISTRATIVE PROCEEDINGS**

**A.     The Initial Medical Disciplinary Proceedings Against the Geiers**

Dr. Mark Geier first obtained his license to practice medicine in Maryland in 1979. For many years, he operated a medical practice in Rockville known as Genetic Centers of America, which offered treatment to children with autism spectrum disorder. His son David Geier, who is not a physician, but who has a bachelor's degree in biology, worked in a subordinate role at the medical practice. Dr. Geier's wife, Anne Geier, was generally not involved in the medical practice, except that she served on a review board established to oversee Dr. Geier's research.

7

Together, Dr. Geier and David Geier promoted a theory that thimerosal, a mercury-based compound used as a preservative in some vaccines, can cause autism in genetically susceptible children. *See generally Blackwell v. Wyeth*, 408 Md. 575, 609-10 (2009) (listing articles written by Mark R. Geier & David A. Geier).[5] Based on that theory, Dr. Geier developed an experimental treatment protocol for autistic children, in which he administered the drug Lupron to suppress hormone production. For some patients, he used chelation therapy, a treatment that removes heavy metals from the body.

As early as 2006, the Board began investigating a series of complaints related to Dr. Geier's medical practice. The Board eventually referred several patient records for physician peer review. On April 27, 2011, the Board summarily suspended Dr. Geier's medical license. The suspension order accused him of "endanger[ing] autistic children and exploit[ing] their parents by administering a treatment protocol that has a known substantial risk of serious harm and which is neither consistent with evidence-based medicine nor generally accepted in the relevant scientific community."

Promptly thereafter, the Board issued formal charges under the Medical Practice Act, accusing Dr. Geier of violating various ethical and professional standards in the use of his treatment protocol. At the same time, the Board pursued separate charges against David Geier, alleging that he engaged in the unlicensed practice of medicine by

---

[5] In *Blackwell v. Wyeth*, 408 Md. 575 (2009), the Court of Appeals upheld a ruling to preclude Dr. Geier from testifying as an expert in an action brought by the parents of an autistic child against a vaccine manufacturer. The Court adopted the trial judge's reasoning "that Dr. Geier's genetic susceptibility theory is no more than hypothesis and conjecture, devoid of a generally accepted methodology to support it[.]" *Id.* at 618.

diagnosing and treating a patient at Dr. Geier's medical practice.

### B. The Cease-and-Desist Order Dated January 25, 2012

While these charges were pending, a representative from a pharmacy-benefits management company informed the Board that someone from Dr. Geier's medical practice had authorized prescription refills after the suspension of Dr. Geier's license. The Board notified Dr. Geier of the new complaint, and he denied writing any prescriptions in Maryland during his suspension. Based on pharmacy records, the Board's staff concluded that Dr. Geier had verbally authorized the prescription refills.

Staff members prepared a report recommending that the Board issue a public cease-and-desist order against Dr. Geier. The Board's staff submitted the proposal for the Board to consider at its monthly meeting in January 2012. The administrative prosecutor who was assigned to prosecute the disciplinary charges against the Geiers drafted the proposed order.

The proposed order stated that the Board had "received information that [Dr. Geier] prescribed drugs to himself, his son and his wife after his license was suspended." One paragraph went on to identify five specific drugs that he allegedly prescribed and the person to whom each drug was prescribed. It did not mention either David Geier or Anne Geier by name, but it instead referred to them as Dr. Geier's "son" and his "wife," respectively. Four footnotes, inserted immediately after the names of four of the drugs, further described the medical conditions that each drug is commonly used to treat. The fifth drug was listed by a common name, and its intended use is known to the public.

Based on the "investigative findings" that Dr. Geier practiced medicine while his

9

license was suspended, the order required Dr. Geier to "**CEASE AND DESIST** from providing any and all services that constitute the practice of medicine[.]" It further provided "that this is a **PUBLIC DOCUMENT**." The order notified Dr. Geier that if he "challenge[d]" the order the matter would be "adjudicated according to the procedures in the Board's regulations at COMAR 10.32.02.03[,]" i.e., under the same procedures used for formal disciplinary actions. *See* COMAR 10.32.02.09.

At a closed-session meeting on January 25, 2012, the 20 Board members in attendance voted unanimously to issue a public cease-and-desist order against Dr. Geier. The chair of the Board signed the document on behalf of the Board. Within the next few days, the Board's technical staff published a PDF document displaying the complete order on the Board's website. Links to that document were posted on the website's home page and on the practitioner profile page for Dr. Geier.

### C. The Amended Cease-and-Desist Order Dated February 22, 2012

After service of the cease-and-desist order, an attorney for Dr. Geier sent a letter to the Board in protest of its decision to "specify the drugs in question including the conditions for which such drugs are used" in a public document. The attorney informed the Board that he had advised the Geier family to pursue civil claims against any personnel "responsible for generating and making public this Order[.]" Among other things, the letter accused the Board of violating a regulation in effect at that time, which authorized the Board to "issue a nonpublic cease and desist order" during an investigation

10

of the unlicensed practice of medicine.  COMAR 10.32.02.06(B)(2).[6]

After receiving the letter of protest, Board counsel sent an urgent email advising high-level Board personnel to "immediately redact" from the Board's website any information identifying a particular patient or a drug prescribed to a patient.  In response, the chair of the Board wrote: "Are we really including 'patient identifiable/specific' information on the website/in public disclosure of charging/conviction documentation????  If we are….., I agree that we should cease this activity asap!!!"  The Board's deputy director instructed the chief of information systems to "[r]emove the cease and desist order from the website and profile" until further discussion.

The Board approved an amended cease-and-desist order at its next monthly meeting, on February 22, 2012.  The amended order omitted mention of any particular patients, drugs, or medical conditions.  It simply stated that the Board had reason to believe that Dr. Geier prescribed drugs "for at least three patients."  A new footnote stated: "Dr. Geier is aware of the names of these three patients.  The names of the drugs and identifying prescription information is known to him and is also available to him upon request."

The amended order was published on the Board's website, and a link to the new document was posted on the website's profile for Dr. Geier.  Yet even though the website no longer included direct links to the original order, the website continued to host the

---

[6] As a result of an amendment enacted in 2013, the Board's regulations now provide that an "initial Board order to cease and desist . . . from the unauthorized practice of medicine" is "a public document[.]"  COMAR 10.32.02.11(E)(1)(a) (2018).

11

page showing the PDF document for the original order. The original order continued to appear in internet search results involving Dr. Geier. Consequently, the original order remained accessible long after the Board issued the amended order.

Through his attorney, Dr. Geier requested a hearing on the amended cease-and-desist order. Several months later, in June 2012, the Board issued formal charges against him, using language substantially similar to the language of the amended cease-and-desist order. The charging document alleged that Dr. Geier had prescribed drugs to three unnamed patients, without identifying the drugs prescribed to those patients.

Dr. Geier contested those charges. The administrative law judge was unconvinced by the evidence connecting Dr. Geier to the prescription refills and recommended that the charges not be upheld. The administrative prosecutor filed exceptions, and after an exceptions hearing, the Board found that someone other than Dr. Geier had authorized the prescription refills in question. The Board dismissed the charges against Dr. Geier for violation of the summary suspension order and terminated the amended cease-and-desist order "as moot" on March 22, 2013.

### D.    Outcome of the Medical Disciplinary Proceedings

Meanwhile, in March 2012, administrative law judges issued the proposed decisions for the other disciplinary proceedings against Dr. Geier and David Geier. An administrative law judge recommended that the Board find that Dr. Geier committed multiple violations of the Medical Practice Act and revoke his license as a penalty. Dr. Geier filed exceptions with the Board. Another administrative law judge recommended that the Board dismiss the charges against David Geier for practicing medicine without a

12

license.  The administrative prosecutor filed exceptions with the Board.

Two days before the exceptions hearings in May 2012, Dr. Geier made a motion asking that all Board members recuse themselves from the proceedings.  Dr. Geier argued that the Board's handling of the proceedings revealed a "personal bias" against him.  He informed the Board that an attorney for the Geier family had sent a notice-of-claim form to the State treasurer regarding their potential civil claims against Board personnel for the unauthorized disclosure of private medical information.  His motion argued that the "prospect of litigation that may affect the personal finances of certain members" would "undoubtedly affect the Board's ability to act toward Dr. Geier with impartiality."

At a meeting on May 23, 2012, the Board denied the recusal motion and proceeded to hear the exceptions.  The Board voted to adopt proposed findings that Dr. Geier committed multiple violations of the Medical Practice Act and to accept the recommendation to revoke his medical license.[7]  The Board also voted to reject the proposed findings that David Geier did not engage in the unauthorized practice of medicine and to levy a $10,000 fine against him.  Both Dr. Geier and David Geier sought judicial review, and the Board's decisions were later upheld in the circuit court and in this Court.  *Mark R. Geier v. Maryland State Bd. of Physicians*, 223 Md. App. 404 (2015) (upholding revocation of Dr. Geier's license); *David A. Geier v. Maryland Bd. of Physicians*, No. 709, Sept. Term 2014 (filed July 31, 2015) (unreported) (upholding

---

[7] The Board concluded that Dr. Geier failed to meet the standard of adequate care in using his Lupron protocol to treat autistic children, that he committed unprofessional conduct by using misleading methods to obtain parental consent for treatments, and that he failed to keep adequate records for those treatments.

penalty against David Geier for the unlicensed practice of medicine).

The Board's scrutiny of Dr. Geier's medical practice spawned an additional investigation of his medical partner, John L. Young, M.D., concerning the continuation of treatment after the suspension of Dr. Geier's license. The Board suspended Dr. Young's license, issued formal charges against him, and ultimately decided in 2014 to impose one year of probation upon the reinstatement of his license. The circuit court upheld that decision, and Dr. Young did not appeal.

## THE PROCEEDINGS IN THE CIRCUIT COURT

### A. The Geiers' Action Against Board Personnel and the Board

On December 21, 2012, during the litigation of the Geiers' petitions for judicial review, three members of the Geier family (Dr. Mark Geier; his wife, Anne Geier; and his son, David Geier) commenced the action at issue in the present appeal by filing a three-count complaint in the Circuit Court for Montgomery County. The complaint named 25 Board personnel as defendants: 20 Board members, the executive director, a deputy director, two staff members, and the administrative prosecutor.

All claims centered on the disclosure of "private medical information" in the original cease-and-desist order, "including the names of the drugs prescribed to [the Geiers] and the specific conditions those prescriptions were intended to treat." The Geiers alleged that they suffered "severe humiliation and embarrassment" when members of the public viewed the order on the Board's website. The Geiers theorized that Board personnel "acted with ill will and with intent to injure" the Geiers, as "part of a systematic effort on the part of the [defendants] to discredit and punish [Dr. Geier and

14

David Geier] for promoting views and treatment plans not endorsed" by the Board.

In Count One, the Geiers raised a federal civil rights claim under 42 U.S.C. § 1983. They claimed to have "a recognized right to privacy in their private medical information, established and protected by the federal Constitution." They alleged that, in "publishing the [o]rder on the internet with [the Geiers'] private medical information," Board personnel knowingly deprived them of "their [c]onstitutional right to privacy as guaranteed by the First, Third, Fourth, Ninth, Fifth, and Fourteenth Amendments[.]" In addition to damages, the Geiers sought attorneys' fees under 42 U.S.C. § 1988.

In Count Two, the Geiers claimed that Board personnel knowingly violated the Maryland Confidentiality of Medical Records Act (Md. Code (1982, 2009 Repl. Vol.), §§ 4-301 through 4-309 of the Health-General Article) by disclosing their prescription information without their consent.

In Count Three, the Geiers claimed that Board personnel committed the tort of invasion of privacy by giving unreasonable publicity to private facts not of legitimate public concern. They asserted that the medical conditions described in the order were "of an extremely personal nature" and that the "disclosure of this type of information would undoubtedly be highly offensive to a reasonable person."

Although the complaint included an allegation that the original cease-and-desist order was still available on the Board's website, the Geiers did not request an injunction. In all counts, the Geiers demanded judgment against the 25 defendants, jointly and severally, for $3 million of compensatory damages and $3 million of punitive damages.

"Alternatively," in Count Three, the Geiers demanded judgment against the Board

15

itself, "as an agency of the State of Maryland, in the amount of . . . $200,000.00 per individual plaintiff[.]" This count appeared to invoke the limited waiver of sovereign immunity from the Maryland Tort Claims Act. *See* SG § 12-104(a) (limiting the tort liability of the State and its units to "$200,000 to a single claimant for injuries arising from a single incident or occurrence"). The Geiers named the Board as a defendant only in Count Three.

## B. Denial of Motion to Dismiss on the Ground of Absolute Immunity

Initially, counsel from the Attorney General's office jointly represented all defendants. Before answering the complaint, the defendants moved for dismissal of all claims.

In addition to challenges specific to each of the three counts, the defendants contended that they possessed "absolute quasi-judicial immunity" as to any claims for damages based on their acts in the medical disciplinary proceedings. Because Maryland's appellate courts have never decided whether quasi-judicial decision-makers have absolute immunity from suit, the defendants relied on *Ostrzenski v. Seigel*, 177 F.3d 245 (4th Cir. 1999). In that case, the Fourth Circuit held that a defendant had absolute immunity with respect to prosecutorial functions that he performed at the behest of the Maryland Board of Physician Quality Assurance, the predecessor of the Board of Physicians. On that ground, the Fourth Circuit affirmed the dismissal of both a federal claim under 42 U.S.C. § 1983 and a claim for invasion of privacy under Maryland law.

The Geiers contended that their claims should proceed because their complaint included allegations of malice. Primarily, they relied on a Maryland statute that protects

16

members and agents of the Board from civil liability for certain actions taken "without malice" in connection with the Board's proceedings. *See* Md. Code (1974, 2013 Repl. Vol.), § 5-715(b) of the Courts and Judicial Proceedings Article. In the alternative, the Geiers argued that the doctrine of absolute quasi-judicial immunity should not apply to the decision to issue a cease-and-desist order.

The court denied the motion to dismiss "to the extent that it relie[d] on the immunities, common law or otherwise[.]" The court believed that it did not "have an adequate record at the motion-to-dismiss stage to fairly, much less, correctly decide whether any of the various immunities" might apply. The court said that it might "revisit" the immunity issue on a motion for summary judgment. The court, however, went on to dismiss Count Two with prejudice on other grounds, concluding that the Confidentiality of Medical Records Act did not create a private cause of action.

In their answer, the defendants raised a host of different defenses, including "absolute quasi-judicial immunity" as to the two remaining counts. As to the count under 42 U.S.C. § 1983, the individual defendants asserted that the alleged conduct did not violate any clearly established constitutional right, while the Board maintained that it could not be sued under that statute. Other defenses to the invasion-of-privacy count largely depended on whether Board personnel had acted with malice: the immunity under § 5-715(b) of the Courts and Judicial Proceedings Article, for members and agents of the Board acting without malice; and the immunity under § 5-522(b) of the State Government Article, for State personnel acting without malice or gross negligence.

17

## C. Grant of Motions to Compel Discovery and for Discovery Sanctions

In search of evidence of malice, the Geiers made expansive discovery requests. They sought to explore not only the process that produced the cease-and-desist order, but also the entire decision-making process in the related medical disciplinary proceedings (which were still the subject of their petitions for judicial review at that time). The defendants frequently withheld the requested information, invoking various common-law evidentiary privileges as well as a statute restricting discovery of the "proceedings, records, or files of the Board or any of its investigatory bodies[.]" HO § 14-410(a)(1). More often than not, the court ordered the defendants to make the requested disclosures, either because it concluded that their objections lacked merit or because it concluded that they failed to make timely objections.

The most consequential of these discovery contests concerned the defendants' reliance on the "deliberative (executive) privilege" as a ground for refusing to produce documents from the medical disciplinary proceedings and refusing to answer questions about the Board's decisions. This evidentiary privilege may prevent the disclosure of certain "confidential advisory and deliberative communications between officials and those who assist them in formulating and deciding upon future governmental action." *Hamilton v. Verdow*, 287 Md. 544, 558 (1980). In cases where the government itself is a party or where a litigant alleges government misconduct, a litigant can overcome a formal claim of deliberative privilege by showing that the litigant's need for production of the information outweighs the government's need for confidentiality. *See id.* at 565-67.

The Geiers moved for an order compelling the defendants to respond to the

18

discovery requests and barring any future assertions of deliberative privilege. The court granted the motion, reasoning that "the privilege must yield" because the case involved "a charge of misconduct" by the agency asserting the privilege. The defendants did not pursue an appeal of that ruling.

The Geiers moved for discovery sanctions a few months later, as the Board was still in the process of gradually disclosing thousands of pages of documents related to the disciplinary proceedings against the Geiers. The court granted the motion in part, but reserved its ruling on the specific sanction to impose.

The Geiers also moved to compel the production of the Board's complete files from the disciplinary proceedings against Dr. Geier's medical partner, Dr. Young (while those proceedings were still being adjudicated). The court granted the motion over the defendants' objections. The defendants noted an appeal from that order. The court then granted a motion for sanctions based on the Board's failure to obey the order compelling disclosure of its files on Dr. Young.

During the pendency of the appeal, the Geiers requested the entry of a default judgment against the Board as a sanction for the Board's noncompliance with a notice of deposition under Md. Rule 2-412(d). The Geiers had moved for sanctions when the witness designated to testify on the Board's behalf failed to appear on the date initially scheduled for the deposition, without obtaining a protective order. The Geiers again moved for sanctions when, at the rescheduled deposition, the Board's designee was inadequately prepared to answer questions about the majority of the 167 topics listed in the notice of deposition. The court granted both motions.

19

On December 16, 2014, the court issued a written opinion announcing its decision to "enter a default against the defendants but on the issue of liability only" as a sanction for the Board's discovery failures. The court announced that it would schedule a trial on damages after resolution of the interlocutory appeal. The defendants filed a second notice of appeal as soon as the court entered the order imposing the sanction of default.

**D.      The First Interlocutory Appellate Decision on Discovery Matters**

The Geiers moved to dismiss both appeals as premature. In a consolidated opinion, this Court explained that the order deeming all defendants in default as to liability was not subject to review until the entry of a final judgment that included any damage award. *Maryland Bd. of Physicians v. Geier* ("*Geier I*"), 225 Md. App. 114, 139-43 (2015). This Court determined, however, that the order compelling the production of documents related to Dr. Young was appealable under the collateral order doctrine. *Id.* at 121. This Court explained that, although routine discovery orders are not immediately appealable, "the collateral order doctrine may permit an immediate appeal of a discovery order that permits a litigant to inquire into the decisional processes of high-level government officials[.]" *Id.* at 131. This holding ensures that those officials need not await the outcome of a trial before seeking to vindicate an objection to the pretrial probing of their decisional thought processes. *See id.* at 131-32.

Addressing the merits of the discovery order, this Court held that HO § 14-410 did not permit the Geiers to discover documents from Dr. Young's disciplinary proceedings in their action against the Board and its personnel. *Geier I*, 225 Md. App. at 144-47. This Court also set aside the discovery order because the court "did not expressly balance

20

the public interest in maintaining the confidentiality of the Board's deliberations concerning Dr. Young against the Geiers' need for disclosure of those documents and the impact of nondisclosure upon the fair administration of justice" when it rejected the assertion of deliberative privilege. *Id.* at 151. Noting that the "decision concerning the discovery order may affect some of the premises of the order of default, such as the breadth and scope of the deposition of the Board's designee[,]" this Court said that "the circuit court, upon a proper motion, should reevaluate" that order on remand. *Id.* at 155.

As part of their interlocutory appeal, the defendants also asked this Court to address the issue of "absolute quasi-judicial immunity," which the circuit court had declined to evaluate when it denied the preliminary motion to dismiss. *Geier I*, 225 Md. App. at 120 & n.2. This Court "express[ed] no opinion on the applicability" of any immunity, explaining that those issues were not properly reviewable in the appeal from the discovery ruling. *Id.* at 152 n.22. This Court nevertheless encouraged the circuit court "[a]s part of the balancing process on remand" to "assess the Board's immunity claims," because the Geiers would not be entitled to discovery "if an immunity insulates the defendants from liability or from suit." *Id.*

### E.     Rejection of Absolute Immunity and Other Rulings on Remand

When the case returned to the circuit court, all defendants moved for reconsideration of the order imposing the sanction of default and for summary judgment in their favor on the ground of absolute quasi-judicial immunity. They also invoked absolute immunity as grounds for a protective order from further discovery requests.

At a hearing on March 24, 2016, the court considered and rejected the defendants'

21

contention that they were entitled to absolute immunity. The court was unmoved by the defendants' reliance on federal cases, which the court deemed not to be controlling. The court also expressed concern that recognizing an absolute immunity would displace § 5-715(b) of the Courts and Judicial Proceedings Article, which grants the Board's members and agents an immunity from civil liability for actions taken without malice. The court observed that the Maryland "legislature has staked out a very detailed, specific statutory scheme" of qualified immunity, and that the defendants had "not cited any a case from the Court of Appeals or the Supreme Court" extending absolute immunity to Board personnel. For identical reasons, the court denied the motion for a protective order based on absolute immunity.

During the same hearing, the court declined to vacate the order imposing the sanction of default as to the defendants' liability. Referring to the Board's delay in producing documents, the failure of the Board's representative to attend her duly-noted deposition, and the Board's subsequent failure to produce a representative who was prepared to testify about all 167 topics in the deposition notice, the court concluded that "the conduct . . . of the defendants here was . . . abysmal, abominable, [and] sanctionable[.]"

At the same hearing, the Geiers pursued yet another motion for sanctions, arguing that the Board improperly withheld audio recordings of its deliberations in the medical disciplinary proceedings. The court granted the motion, reasoning that the defendants had previously "waived" their assertion of privilege over the deliberations.

The defendants immediately noted another appeal, seeking review of each of the

22

rulings made on remand in favor of the Geiers. The Court of Appeals granted certiorari on its own initiative before any consideration by this Court.

## F.     The Second Interlocutory Appellate Decision on Discovery Matters

In the second round of appellate review, the defendants implored the Court "to consider their claims regarding the denial of their quasi-judicial immunity in the orders denying their motions for reconsideration and for a protective order." *Maryland Board of Physicians v. Geier* ("*Geier II*"), 451 Md. 526, 553 (2017). The Court, however, held that neither of those orders were immediately appealable under the collateral order doctrine. *Id.* at 555-57. The Court relied on its prior pronouncement that "'[i]nterlocutory trial orders overruling immunity claims by . . . agencies . . . are not appealable under this doctrine.'" *Id.* at 556 (quoting *Dawkins v. Baltimore City Police Dep't*, 376 Md. 53, 65 (2003)). The Court concluded that members of the Board of Physicians, "a quasi-judicial body within an administrative agency[,]" were not in the limited categories of officials that may be entitled to take an immediate appeal from an order denying immunity. *Geier II*, 451 Md. at 557.[8]

The Court of Appeals held that only one order, the order granting sanctions based on the failure to produce the audio recordings, was "properly appealable" at that time under "the narrow exception allowing discovery orders denying 'high level decision

---

[8] The Court had previously decided that "interlocutory orders overruling immunity defenses asserted by the Governor, Lieutenant Governor, Comptroller, Treasurer, Attorney General, Speaker of the House, President of the Senate, or judges as defined in Article IV, § 2, of the Maryland Constitution" might be immediately appealable under the collateral order doctrine. *Dawkins v. Baltimore City Police Dep't*, 376 Md. at 65.

makers' their executive privilege to be immediately appealable under the collateral order doctrine." *Geier II*, 451 Md. at 547. The Court emphasized that "[r]egardless of the outcome of the trial," the harm done from "the disruption to the administrative process, caused by placing the officials under pretrial scrutiny" would be "impossible to cure" after the Board disclosed the audio recordings of its deliberations to the Geiers. *Id.* at 552 (citation and quotation marks omitted).

On the merits, the Court determined that the defendants made a timely assertion of their deliberative privilege over the audio recordings. *Geier II*, 451 Md. at 567. The Court reasoned that "preventing the disclosure of [the Board's] pre-decisional deliberations greatly benefits the public by allowing [the Board] to undertake [its] core public protection function without the constant threat of harassment and intimidation by aggrieved parties." *Id.* at 569. The Court concluded that the Geiers failed to overcome the presumption arising from the formal claim of privilege over the deliberations. *Id.* at 570. Consequently, the recordings were "not discoverable" by the Geiers. *Id.*

## G.    **Remaining Pretrial Rulings**

Despite the two appeals on discovery matters, the order imposing a default as to liability remained in place against all defendants. Hence, when the case again returned to the circuit court, the court permitted the Geiers to withdraw their demand for a jury trial on the remaining issue of damages. *See* Md. Rule 2-325(f) ("[a]n election for trial by jury may be withdrawn only with the consent of all parties not in default"). The court rejected the defendants' argument that they still had the right to have a jury determine damages despite the default as to liability.

24

In addition, the defendants collectively moved for a partial dismissal, or for partial summary judgment, as to the invasion-of-privacy claim originally raised by Anne Geier. Mrs. Geier had died in October 2014, and thereafter Dr. Geier, in his capacity as personal representative of his wife's estate, had substituted himself for his wife. The defendants contended that "an action for invasion of privacy can be maintained only by a living individual whose privacy is invaded." Restatement (Second) of Torts § 625I (1977). The circuit court disagreed, concluding that the invasion-of-privacy claim was not a "cause of action for slander[,]" which would abate upon a party's death.

Six Board members, apparently dissatisfied with their representation through the Attorney General's office, retained private counsel as the trial date approached. Those Board members each filed motions asking the court again to reconsider the decision to sanction them for the Board's discovery failures. Those defendants also moved for summary judgment, arguing that the Geiers had no evidence of malice and that, therefore, they should be immune from liability under Maryland statutes. Other defendants, still represented through the Attorney General's office, moved for partial summary judgment as to any claims for punitive damages, arguing that the Geiers had no evidence of actual malice. The court denied each of those motions and allowed all claims for damages to proceed against all defendants.

At a hearing during the week before trial, the circuit court announced what it called the "analytical framework" for the bench trial on damages. The court ruled that the order imposing the sanction of default would satisfy the Geiers' burden of proof as to the liability of all defendants. The court also ruled that, to show their entitlement to

25

punitive damages from any particular defendant, the Geiers still needed to prove by clear and convincing evidence that the defendant acted with actual malice.

The court nevertheless imposed some restrictions on the manner in which the defendants might rebut the charge of malice. The court, on its own initiative, decided that it would "draw an adverse inference" against "any defendant who either invoked the [deliberative] privilege or who benefitted from the invocation of the privilege." The court further decided: "to the extent that a party has invoked a privilege or benefitted from it, and thus thwarted the discovery of relevant facts, he or she . . . may not testify about any of the undisclosed facts, or facts flowing from those undisclosed facts, at trial." Finally, the court said that it would impose "consequences, evidentiary or otherwise[,]" if it found that the defendants failed to preserve relevant evidence after the Board first received warning of the Geiers' contemplated lawsuit.

## H.     Bench Trial on Damages

The trial on damages generated eight days of testimony in July and August of 2017. The Geiers offered testimony from Dr. Geier and David Geier, transcribed testimony from the late Mrs. Geier, and documentary exhibits.

At the end of the Geiers' case-in-chief, the individual defendants moved for judgment, arguing that the Geiers had produced insufficient evidence of malice. The court denied the motions, opining that "the record [was] replete . . . with legally sufficient evidence, direct and circumstantial" upon which to "find actual malice . . . by clear and convincing evidence."

During the defense case, the Geiers objected to the introduction of evidence about

26

the roles of individual defendants in the meeting on January 25, 2012, at which the Board voted to issue the public cease-and-desist order. The defendants who were represented by private counsel asked to waive the prior assertions of deliberative privilege. An assistant attorney general representing other individuals (but not the Board) also asked to waive the privilege. A different attorney from the same office, representing the Board (but none of the individual defendants), declined to waive the privilege on behalf of the Board. The court refused to permit any defendant to waive the deliberative privilege. The court reasoned that the defendants could not waive the privilege after they had invoked it successfully in their appeal to the Court of Appeals to prevent pretrial discovery of the audio recordings.

The court interpreted the Court of Appeals' holding on deliberative privilege to require the exclusion of not only the recordings but also other evidence of the deliberations. Under that rationale, the court sustained objections to the testimony of individual defendants about their participation in the meeting of January 25, 2012. Various Board members proffered that, if they had been permitted to testify, they would have said that they did not review the text of the cease-and-desist order before or during that meeting. The court did admit testimony that, as a matter of custom, Board members would not read orders before voting on proposed actions, but would rely on the Board's attorneys and staff to determine the wording of orders.

At the close of all evidence, the defendants renewed their motions for judgment as to punitive damages, arguing that the trial record included insufficient evidence of malice. In addition, the defendants moved for judgment based on the absolute immunity

27

arguments from their pretrial motions. The court denied the motions without comment.

## I.     Opinion Awarding Compensatory and Punitive Damages

Four months after trial, the circuit court issued a 112-page memorandum opinion awarding damages to the Geiers based on "the knowing and intentional publication of confidential medical information" by the defendants.

Before discussing damages, the court first addressed the Geiers' allegations of spoliation from an unresolved motion for sanctions. It was undisputed that, a few months after the Board first received notice of the Geiers' contemplated lawsuit, the technical staff deleted electronic data of many email communications when the Department of Health and Mental Hygiene transitioned from one email system to another. The court found that, although the Board's staff printed hard copies of a "handful" of relevant emails, the defendants "intentionally failed to preserve" the electronic copies. The court further found that Board members failed to make diligent searches of private email accounts through which they received some documents related to hearings. The court ruled that "the defendants' intentional spoliation of the Board's e-mail server and hard drives, along with the defendants' failure to preserve their own personal e-mail account information, provides an additional ground to enter a default against all of the defendants[.]"

The court reasoned that its "two default orders . . . satisf[ied] the plaintiffs' burden of proof as to the defendants' liability for the specific causes of action pled." The court ruled that, "[i]n light of the default orders," it would "not consider any of the defendants' negative or affirmative defenses, including the immunity defenses." The court

28

considered the issue of malice, on a defendant-by-defendant basis, solely for the purpose of assessing punitive damages. The court equated actual malice with a defendant's "actual knowledge of" or "willful refusal to know" of "the publication of the [Geiers'] private medical information[,]" along with a defendant's intent "to disclose this information to the public in violation of the law."

The court found that defendant Victoria Pepper, the administrative prosecutor who drafted the cease-and-desist order, intentionally included prescription information in the order for the purpose of embarrassing the Geier family. The court found that defendant Joshua Schafer, the staff member who had written the investigative report recommending the order, supported the publication of the order knowing that it included the Geiers' prescription information. The court concluded that both Ms. Pepper and Mr. Schafer acted with actual malice. Those findings rested, in part, on emails between Ms. Pepper and Mr. Schafer which, in the court's view, evinced an "unprofessional" tone and appeared to "celebrate[]" developments to the detriment of Dr. Geier and David Geier.

In its opinion, the court reiterated its pretrial decision to "draw an adverse inference from the invocation of the [deliberative] privilege, as to any defendant who invoked or benefitted from the invocation of the privilege and asked the privilege to be upheld by the Court of Appeals."[9] The court found that all Board members who attended

---

[9] The circuit court reasoned that the Court of Appeals "anticipated the drawing of an adverse inference" in footnote 8 of *Hamilton v. Verdow*. There, the Court wrote that, in cases where the government is a party, "a determination by a court that the government's need for confidentiality is outweighed by the opponent's need for disclosure[] does not absolutely prevent the government from maintaining confidentiality." *Hamilton v. Verdow*, 287 Md. at 564 n.8. The Court said that, even

29

the meeting on January 25, 2012, knew that the cease-and-desist order contained the Geiers' private medical information before they voted to approve it. The court said that it "disbelieve[d]" testimony that the Board members customarily voted on disciplinary matters without reading the text of orders. To the extent that it considered their testimony, the court said that it "disbelieve[d] the testimony of the Board members that they did not see the Order at the meeting and did not read it before it was signed[.]" The court credited testimony from one Board member who recalled reading the order during the January 2012 meeting. Notwithstanding the other rulings on privilege, the court permitted the Board member to testify about the meetings because she had done so without objection during a deposition.

The court found that, even though the Board's deputy director promptly instructed the technical staff to remove the original order from the website, the original order remained accessible for nearly 18 months, until July 2013. The court faulted all defendants for their collective inaction during that period of time – even the defendants who left their positions with the Board well before July 2013. The court reasoned that all defendants should have known that the original order remained on the website because the Geiers' lawyer said so in the statutory notice-of-claim form to the State treasurer in March 2012, attached a copy of the notice-of-claim form as an exhibit to the recusal

after the court orders the government to disclose the putatively privileged information, the government still has "the choice of either producing the information or having the issue to which the information relates resolved against it." *Id.* The adverse inference suggested in this footnote arises where the court has rejected the assertion of privilege and the government still declines to disclose the information. Here, by contrast, the Court of Appeals upheld the assertion of privilege. *Geier II*, 451 Md. at 568-70.

motion in May 2012, and repeated the allegation in the civil complaint in December 2012.

The court said that the Board members "knew . . . that the problem had not been fixed," but that they "simply did not care." Overall, the court concluded: "What was done here . . . was done intentionally to embarrass and humiliate the Geier family because [Ms. Pepper], [Mr. Schafer,] and each member of the Board did not like the way [Dr. Geier] practiced medicine and wanted to send a message and teach him (and David Geier, who worked hand and glove with his father) a lesson."

The court concluded that the Geiers "had proven, by clear and convincing evidence" that 13 Board members (including one who did not attend the January 2012 meeting) "acted with actual malice." The court found that one Board member "did not act with actual malice[,]" largely because the court credited her testimony about the Board's meetings. The court said it was "not persuaded" that four of the Board members acted with malice because, "[i]n their particular cases, the court believe[d] their lack of memory and assertions of good will." The court made no express finding as to whether two other Board members acted with malice.

The court found that three defendants "acted negligently in this matter." Those defendants were: the chief of compliance who supervised Mr. Schafer; the deputy director who ordered the removal of the original order from the website; and the executive director who took office one month after the Board issued the original order. The court ruled that the harm resulting from their "negligent conduct" was "attributable to the State of Maryland, and to the Board." The court said: "As a consequence, the State

31

of Maryland is responsible for payment of the compensatory award."

The court found that all three Geier plaintiffs suffered injury, including "insult, embarrassment, humiliation, mental pain and suffering, nervousness, and indignity[,]" as the result of the "acts of each defendant." The court awarded compensatory damages of $500,000 to Dr. Geier; $500,000 to the estate of Anne Geier; and $250,000 to David Geier. The court further awarded punitive damages of $500,000 to Dr. Geier; $500,000 to Anne Geier; and $250,000 to David Geier.

Finally, the court allocated punitive damages in different amounts among Ms. Pepper, Mr. Schafer, and 15 Board members, based on factors including the financial ability and level of culpability of those defendants.

## J.      Award of Attorneys' Fees and Entry of Final Judgment

The court entered the memorandum opinion awarding damages on December 7, 2017. All defendants filed a notice of appeal on the same day that the opinion was entered. The Geiers promptly petitioned for an award of attorneys' fees under 42 U.S.C. § 1988, based on the success of their claim under 42 U.S.C. § 1983.

Six weeks after the court entered the opinion awarding damages, counsel for the Geiers sent an email directly to the trial judge's law clerk, without sending a copy of the email to any opposing counsel. The email "point[ed] out [an] inconsistency" in the opinion. Specifically, on the final page of the opinion, the court allocated $200,000 of punitive damages to one of the Board members, Dr. Nalla Ramakrishna, even though the factual findings stated that the court was not persuaded that Dr. Ramakrishna acted with actual malice. Counsel for the Geiers suggested that he could "raise the issue in a motion

32

to amend" or that the court might prefer to "address this issue *sua sponte*[.]"

Two weeks after receiving the email, the court issued an order stating that it had "identified a clerical error" in the opinion and "correct[ing] that error" under Rule 2-535(d). The order amended two sentences of its opinion, to remove Dr. Ramakrishna from the list of defendants who had not acted with actual malice and to include him in the list of defendants who did act with actual malice.

The defendants later learned, from an exhibit to a supplemental petition for attorneys' fees, that counsel for the Geiers had made a billing record of the time spent writing the email. Upon the defendants' request, counsel for the Geiers forwarded the email.[10]

After an evidentiary hearing on attorneys' fees, the court issued a memorandum opinion explaining the basis for its decision to award fees under 42 U.S.C. § 1988. On April 25, 2018, the court entered an order awarding $2,393,931.30 in attorneys' fees and $85,616.21 in litigation costs. On the same day, the court entered an order directing the clerk to enter final judgment. The order imposed joint and several liability against all defendants for the compensatory damages, attorneys' fees, and litigation costs. It obligated 17 of the individual defendants to pay punitive damages in specified amounts.[11]

---

[10] The email is not part of the trial record. The defendants reproduced the document in an appendix to their appellate brief. This Court granted an unopposed motion to supplement the record on appeal so that it would include a copy of the email.

[11] The judgment obligates 17 defendants to pay a total of $1.91 million in punitive damages even though it "award[s]" a total of only $1.25 million in punitive damages to the Geiers.

All defendants filed another notice of appeal upon the entry of final judgment. The Geiers noted a cross-appeal, which they later dismissed voluntarily. This Court consolidated the defendants' appeal from the memorandum opinion entered on December 7, 2017, with their appeal from the judgment entered on April 25, 2018.

<u>SCOPE OF APPELLATE REVIEW</u>

The sequence of post-trial events has generated some confusion about when exactly the circuit court entered its final judgment. Because that date is potentially significant to our scope of review, we will clarify that matter before addressing the substance of the appeal.

Subject to a few narrow exceptions, "appellate jurisdiction in Maryland is ordinarily limited to review of final judgments." *Hiob v. Progressive American Ins. Co.*, 440 Md. 466, 475 (2014) (citing Md. Code, § 12-301 of the Courts and Judicial Proceedings Article). "Maryland Rule 8-202(a) details the time limitation for a party to file an appeal from a final judgment in the circuit court." *Rosales v. State*, 463 Md. 552, 563-64 (2019).

The defendants here noted an appeal from the "Memorandum Opinion and Order" entered on December 7, 2017; they did not appeal from the order entered on January 29, 2018, which corrected the findings regarding one defendant, Dr. Ramakrishna; and they noted a second appeal from the "Order to Enter Judgment" entered on April 25, 2018. The defendants seek review of all awards of damages and fees, including the rulings that concern Dr. Ramakrishna.

In many respects, the memorandum opinion appeared to announce a final decision.

34

The introduction stated: "This decision resolves all the outstanding discovery motions, as well as the plaintiffs' claims on the merits for compensatory and punitive damages." Unlike prior decisions deeming the defendants in default as to liability only, the opinion "awarded" damages in definite amounts. The final paragraph stated: "All other relief requested, and all other outstanding motions, are denied." In light of that language, it is more than understandable that the defendants decided to file a notice of appeal. When a court issues a ruling that appears to be conclusive, practitioners can and should secure their clients' interests by filing a "timely protective notice of appeal." *County Council of Prince George's County v. Dutcher*, 365 Md. 399, 411 (2001).

On closer inspection, however, the 112-page opinion did not set forth a final judgment within the meaning of the Maryland Rules. A final judgment does not take effect unless and until "it is set forth on a 'separate document' consistent with Rule 2-601(a) and is entered on the docket consistent with Rule 2-601(b)." *Hiob v. Progressive American Ins. Co.*, 440 Md. at 471-72. The separate-document requirement "'must be mechanically applied in determining whether an appeal is timely.'" *Id.* at 480 (quoting *Byrum v. Horning*, 360 Md. 23, 32 (2000)).

Full satisfaction of Rule 2-601(a) means something other than writing a few arguably conclusive sentences spread across the final pages of a lengthy opinion. The document embodying the judgment should "clearly indicate . . . which party has prevailed on which issues and what type of relief, if any, has been granted by the court." *Hiob v. Progressive American Ins. Co.*, 440 Md. at 486. To ensure clarity, Rule 2-601(a) ordinarily requires that the separate document be "distinct from any opinion or

35

memorandum" explaining the basis for the judgment. *Byrum v. Horning*, 360 Md. at 26-27 (citation and internal quotation marks omitted). This requirement of separation is designed to relieve the uncertainties that may result if the court writes "an opinion or memorandum containing some apparently directive or dispositive words" (*id.* at 26), but otherwise leaves it "difficult for the clerk to determine the precise nature of the judgment and the wording that needed to be included in the docket entry reflecting the court's judgment." *Wireless One, Inc. v. Mayor of Baltimore City*, 239 Md. App. 687, 695 n.3 (2018), *cert. granted*, 462 Md. 556 (2019).

"Under a mechanical application of Rule 2-601" (*Hiob v. Progressive American Ins. Co.*, 440 Md. at 497), the court's memorandum opinion was not effective as a final judgment. The opinion purported to "award[]" specific amounts of compensatory damages to the plaintiffs, but it did not state which defendants were liable for the damages. The answer to that question was not obvious, in light of the court's findings that only certain defendants had acted maliciously (or even negligently) and the court's apparent reliance on the Maryland Tort Claims Act to impose liability against "the State" as well. Adding further ambiguity, the total amount of punitive damages "allocated" to the defendants exceeded the punitive damages "awarded" on behalf of the plaintiffs. In addition, the opinion allocated punitive damages to one defendant in two different amounts. Overall, the opinion did not provide a reader with the information needed to discern the amount of each defendant's liability for damages.

Not surprisingly, the clerk of the circuit court did not treat the memorandum opinion as a judgment in any particular amount against any defendant. The clerk did not

record or index a judgment in the judgment records. The clerk docketed the opinion under its title with the following notation: "punitive damages are awarded in this case, for each plaintiff; all other relief requested, and all other outstanding motions, are denied[.]" The clerk mailed copies of the opinion to the parties, but did not send notice that a judgment had been entered.

At a hearing two weeks later, the Geiers opposed the defendants' motion to stay enforcement of the "judgment," on the ground that the opinion was not a final judgment. The court reviewed the docket entries and observed that "the clerk [had] docketed [the] opinion[,]" but the court did not "see the entry of judgment by the clerk." At a subsequent hearing, the court rejected the Geiers' request to order "judgment interest" to run from the date of the entry of the opinion, again observing that "no judgment ha[d] been entered in the case by the clerk." The court explained that it still intended to "direct the clerk in a written order to enter the damage award judgments." The court said that the subsequent order would specify the "amount to enter as to each defendant" so as to provide "the information [the clerk] needs to comply with the rule regarding entry of judgments."

Afterwards, the court signed the "Order to Enter Judgment." That document included language imposing liability "against each of the Defendants, jointly and severally" for the compensatory damages, attorneys' fees, and litigation costs. It made 17 particular defendants "liable for punitive damages" in specific amounts. It directed the clerk to "enter a final judgment in accordance with Md. Rule 2-601." The clerk complied on April 25, 2018, by docketing the judgment, recording monetary judgments against

37

each defendant in the judgment index, and sending notice of the entry of judgment.[12]

Unlike the earlier memorandum opinion, the order entered on April 25, 2018, satisfied the separate document requirement. By filing a notice of appeal on that date, all defendants have taken a timely appeal from the final judgment under Md. Rule 8-202(a). Our review of that judgment encompasses all "interlocutory order[s] previously entered in the action[,]" except for the discovery orders from which appeals have "previously been taken" and "decided on the merits" by the appellate courts. *See* Md. Rule 8-131(d).

### QUESTIONS PRESENTED

The defendants submitted one set of appellate briefs on behalf of the 25 Board personnel, as individuals, and one on behalf of the Board of Physicians, as a state agency. The opening brief from the "Individual Appellants" presents 11 questions. The Board has adopted their arguments regarding six of those questions and has raised one additional question. The appendix to this opinion reproduces the lists of questions presented, in full.

Our discussion will begin with the following question posed by the Board alone: "Did the court err in entering judgment against the State for damages, attorneys' fees, and costs for claims under 42 U.S.C. § 1983, where the State is not a 'person' under § 1983,

---

[12] For actions commenced on or after January 1, 2014, the Court of Appeals has established procedures for claims of attorneys' fees and related expenses. *See* Md. Rules 2-701 through 2-706. Although this case predated the effective date of those rules, the procedure used by the trial court here follows the road map set forth in Rule 2-703 for cases where a party raises a claim for attorneys' fees allowed by a statute, where the court defers the presentation of evidence on the attorneys' fees until after trial, and where the court intends to include the fee award as part of the judgment.

and the State has Eleventh Amendment immunity?" We conclude that the Geiers were not entitled to a judgment against the Board as to the count under 42 U.S.C. § 1983 because the Geiers did not and could not name the Board as a defendant to that count.

As the first question presented in their brief, the individual defendants ask: "Are defendants entitled to absolute quasi-judicial immunity because the Geiers' claims are based entirely on actions taken in ongoing physician-disciplinary proceedings in which the Board of Physicians was performing a discretionary quasi-judicial function?" We conclude that the Board personnel have absolute immunity from both the federal claim and the Maryland tort claim. By extension, there is no basis to make the Board liable, either.

In their second question presented, the individual defendants ask: "Were defendants denied due process of law, and did the court abuse its discretion in entering a default judgment based on non-prejudicial failures of discovery by the Board?" We conclude that the court abused its discretion when it sanctioned the individual defendants for discovery failures attributed to the Board. Because the individual defendants never should have been sanctioned with a default, they were fully entitled to rely on their absolute immunity as a ground for summary judgment. The judgment in favor of those defendants inures to the benefit of the Board regardless of whether the Board was in default.

In light of those determinations, we need not decide any other issue. Nothing in

39

this opinion should be construed as a decision on the other challenges to the judgment.[13]

**DISCUSSION**

I.     **Liability of the State Board of Physicians Under 42 U.S.C. § 1983**

The two surviving counts were: a federal civil rights claim, under 42 U.S.C § 1983, against individual Board personnel; and an invasion-of-privacy claim, under Maryland tort law, against Board personnel and the Board itself.  Proper analysis requires this Court to apply two different bodies of law to these separate counts.  *See DiPino v. Davis*, 354 Md. 18, 45 (1999).  A state court must apply federal law when it exercises jurisdiction over a § 1983 claim.  *See County Exec. of Prince George's County v. Doe*, 300 Md. 445, 454 (1984).

42 U.S.C. § 1983 provides, in pertinent part: "Every person who, under color of any statute, . . . [or] regulation[] . . . of any State . . ., subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law[.]"  This statute "permits a plaintiff to recover damages when an individual, acting under the color of state law, transgresses a federally created right of the plaintiff." *Okwa v. Harper*, 360 Md. 191, 192 (2000) (citing *Howlett v. Rose*, 496 U.S. 356, 358 (1990)).

---

[13] We will not address the Board's so-called Eleventh Amendment immunity, a constitutional issue that is "unnecessary for our holding in this case." *Dep't of Pub. Safety & Corr. Servs. v. Doe*, 439 Md. 201, 221 (2014).  Because we conclude that the circuit court abused its discretion when it imposed discovery sanctions, we will not address the defendants' argument that the court deprived them of due process of law. *See Fisher v. McCrary Crescent City, LLC*, 186 Md. App. 86, 135 (2009).

40

As the statutory language suggests, the defendant in a § 1983 action must be a "person." *Okwa v. Harper*, 360 Md. at 192. The statute does not authorize an action for damages against a state or a state agency, neither of which are "person[s]" within the meaning of the statute. *See Manikhi v. Mass Transit Admin.*, 360 Md. 333, 360 (2000). The Geiers' complaint correctly described the Board of Physicians as an agency of the State of Maryland. Therefore, the Board "can have no § 1983 liability." *Id.*

Perhaps recognizing that the Board could not be sued for damages under § 1983, the Geiers did not name the Board as a defendant in Count One. Rather, they sued Board personnel based on their alleged actions "as individuals and under color of state law."

Federal law recognizes a dichotomy between § 1983 claims against state officials in their "official" capacities as opposed to their "individual" capacities. *See Ritchie v. Donnelly*, 324 Md. 344, 354-55 (1991). An official-capacity suit is, in substance, "'a suit against the official's office[,]'" which makes it "'no different from a suit against the state itself.'" *Id.* at 355 (quoting *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989)). A state official "sued in his or her official capacity, is not considered a 'person' when a plaintiff brings a § 1983 action for monetary damages." *Okwa v. Harper*, 360 Md. at 193. "On the other hand, a state officer or employee, sued in his [or her] individual capacity, is a 'person' subject to a suit for money damages under § 1983." *Ritchie v. Donnelly*, 324 Md. at 355 (emphasis removed).

In their preliminary motion to dismiss, the defendants argued that the Geiers could not maintain any claim for damages under § 1983 against the Board, as a state agency. At the ensuing hearing, counsel for the Geiers explained that the Board was "not a

41

defendant" in Count One, and that they were suing the named defendants "in their personal capacit[ies]." For further clarification, counsel stated on the record that the Board was a defendant only as to Count Three, the Maryland tort claim.

The Geiers eventually prevailed on Counts One and Three when the court imposed a default as to liability and assessed damages after the bench trial. The Geiers then requested an award of attorneys' fees under 42 U.S.C. § 1988(b), which authorizes a court to award reasonable attorneys' fees to "the prevailing party" in an action to enforce 42 U.S.C. § 1983 and certain other statutes. In response, the defendants asserted that, because the Board was never a defendant to Count One, the Board had no liability under § 1983 and could not be liable for attorneys' fees under § 1988.

In the opinion explaining the award of attorneys' fees, the court did not articulate any basis for requiring the Board to pay those fees. The court nevertheless ordered all "defendants, jointly and severally," to pay $2,392,931.30 of attorneys' fees. On appeal, the Board asks this Court to reverse the "judgment" against it on the § 1983 claim and the order requiring the Board to pay attorneys' fees.

The record fails to show that the judgment even included any determination of the Board's liability on Count One. As the Geiers have noted: "A judgment by default constitutes an admission by the defaulting party of its liability *for the causes of action set out in the complaint*." *Pacific Mortg. & Inv. Grp., Ltd. v. Horn*, 100 Md. App. 311, 332 (1994) (emphasis added). Yet the complaint did not set out any § 1983 claim against the Board, the State, or anyone in an official capacity. Any such claim would have been subject to dismissal. *See Manikhi v. Mass Transit Admin.*, 360 Md. at 361; *Ritchie v.*

42

*Donnelly*, 324 Md. at 358-59.

The Geiers argue that the Board "can be held liable under § 1983" because the State has "consented" to certain suits through the Maryland Tort Claims Act. *See* SG § 12-104(a)(1) (subject to certain exclusions and limitations, waiving "the immunity of the State and its units . . . as to a tort action, in a court of the State"). Even if this waiver of immunity could be construed to include a § 1983 action, no enactment of the General Assembly can "create a cause of action under § 1983 against an entity whom Congress has not subjected to liability." *Howlett v. Rose*, 496 U.S. at 376. The State of Maryland and its agencies are not "person[s]" subject to suit for damages under § 1983, regardless of whether a plaintiff brings suit in federal court or in state court. *See id.* at 365, 376.

In any event, we must "decide the case not on the basis of what the plaintiffs might have done, but on the basis of what they actually did." *State v. Braverman*, 228 Md. App. 239, 254 (2016). Because the Geiers did not sue the Board under Count One, the order imposing the default did not make the Board liable under Count One.

The Geiers did not (and could not) prevail on a nonexistent (and invalid) § 1983 claim against the Board. It follows that the court had no basis to order the Board to pay attorneys' fees. A defendant's "liability on the merits" under § 1983 and "responsibility for fees" under § 1988 "go hand in hand[.]" *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). Accordingly, "a suit against a government official in his or her personal capacity cannot lead to imposition of fee liability upon the government entity." *Id.* at 167. Because the Geiers asserted "no claim for merits relief" against the Board under § 1983, "the fee award against [the Board] must be reversed." *Id.* at 170.

43

## II.      Claim Against Board Personnel Under 42 U.S.C. § 1983

Unlike the Board, the 25 natural persons named in Count One were "person[s]" capable of being sued for damages under 42 U.S.C. § 1983, at least in their personal capacities. From the beginning of this case, those defendants have maintained that they are entitled to absolute immunity. Their contention is correct.

### A.      Absolute Judicial and Prosecutorial Immunity in § 1983 Actions

Federal law governs a person's immunity from a § 1983 claim. *See, e.g.*, *Okwa v. Harper*, 360 Md. 161, 197 (2000). Most of the Geiers' arguments about immunity concern Maryland law. Of course, Maryland law "does not control this [§ 1983] claim even though the federal cause of action is being asserted in the [Maryland] courts." *Martinez v. California*, 444 U.S. 277, 284 (1980).

Federal law grants most officials no more than a "qualified" immunity in defense of a § 1983 claim. *See, e.g.*, *Dehn Motor Sales, LLC v. Schultz*, 439 Md. 460, 489 (2014). Under that form of qualified immunity, "'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Id.* at 474 n.18 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).[14] The Supreme Court has recognized, however, "that some officials perform 'special functions' which, because of their similarity to functions [for which an official] would have been immune when Congress enacted §

_____

[14] This opinion does not address whether the defendants' alleged conduct violated a clearly established constitutional right of which a reasonable person would have known.

44

1983, deserve absolute protection from damages liability." *Buckley v. Fitzsimmons*, 509 U.S. 259, 268-69 (1993). To determine whether an official has absolute immunity, the Supreme Court uses "a 'functional approach,' which looks to 'the nature of function performed, not the identity of the actor who performed it.'" *Id.* at 269 (citations omitted).

The Supreme Court has consistently recognized the principle of absolute judicial immunity in § 1983 cases. *See Mireles v. Waco*, 502 U.S. 9, 9 (1991) (per curiam). At common law, "'judges of courts of superior or general jurisdiction are not liable to civil actions for their judicial acts, even when such acts are in excess of their jurisdiction, and are alleged to have been done maliciously or corruptly.'" *Stump v. Sparkman*, 435 U.S. 349, 355-56 (1978) (quoting *Bradley v. Fisher*, 80 U.S. (13 Wall.) 335, 351 (1871)). The Supreme Court has concluded that the enactment of § 1983 did not alter this "well established" doctrine. *Pierson v. Ray*, 386 U.S. 547, 554-55 (1967). State judges, therefore, are absolutely immune from being sued for damages under § 1983 based on judicial acts within the general scope of their jurisdiction. *See Stump v. Sparkman*, 435 U.S. at 356.

Because judicial immunity is "an immunity from suit, not just from ultimate assessment of damages[,]" it cannot be "overcome by allegations of bad faith or malice, the existence of which ordinarily cannot be resolved without engaging in discovery and eventual trial." *Mireles v. Waco*, 502 U.S. at 11 (citations omitted). This immunity is unaffected "by any consideration of the motives" for the judicial act. *Bradley v. Fisher*, 80 U.S. (13 Wall.) at 354. Moreover, a judicial officer who performs a judicial act "cannot be subjected to responsibility for it in a civil action, however erroneous the act

45

may have been, and however injurious in its consequences it may have proved to the plaintiff." *Id.* at 347. A judge is not subject to liability even if he or she committed "grave procedural errors" (*Stump v. Sparkman*, 435 U.S. at 359) or acted "in excess of his [or her] authority[.]" *Id.* at 356. A judge may be sued only for "actions not taken in the judge's judicial capacity" or for "actions, though judicial in nature, taken in the complete absence of all jurisdiction." *Mireles v. Waco*, 502 U.S. at 11 (citations omitted).

The doctrine of judicial immunity is rooted in "a long-settled understanding that the independent and impartial exercise of judgment vital to the judiciary might be impaired by exposure to potential damages liability." *Antoine v. Byers & Anderson, Inc.*, 508 U.S. 429, 435 (1993). Judges must decide "[c]ontroversies involving not merely great pecuniary interests, but the liberty and character of the parties, and consequently exciting the deepest feelings, . . . in which there is great conflict in the evidence and great doubt as to the law which should govern their decision." *Bradley v. Fisher*, 80 U.S. (13 Wall.) at 348. Dissatisfied litigants frequently will accuse judges of improper motives. *Id.* "If civil actions could be maintained in such cases against the judge, because the losing party should see fit to allege in [a] complaint that the acts of the judge were done with partiality, or maliciously, or corruptly, the protection essential to judicial independence would be entirely swept away." *Id.*

The same policy considerations that support this immunity for judges led to the recognition of a common-law absolute immunity for prosecutors. *Imbler v. Pachtman*, 424 U.S. 409, 422-23 (1976). In short, the "public trust of the prosecutor's office would suffer if he [or she] were constrained in making every decision by the consequences in

terms of his [or her] own potential liability for a suit in damages." *Id.* at 424-25. Courts

have "described the prosecutor's immunity as a form of 'quasi-judicial' immunity and

referred to it as derivative of the immunity of judges[.]" *Id.* at 420. A state prosecutor is

immune from being sued for damages under § 1983 based on acts that are closely

connected to the judicial process or that implicate the prosecutor's role as the advocate

for the State. *See id.* at 430-31 & n.33. This absolute immunity attaches to acts such as:

initiating a prosecution and presenting the State's case at a criminal trial (*id.* at 431);

presenting evidence in support of an application for a search warrant (*Burns v. Reed*, 500

U.S. 478, 492 (1991)); and preparing and filing charging documents (*Kalina v. Fletcher*,

522 U.S. 118, 129 (1997)). These functions are comparable to those of judges, insofar as

prosecutors "exercise a discretionary judgment on the basis of evidence" available to

them. *Imbler v. Pachtman*, 424 U.S. at 423 n.20.

B.      **Absolute Immunity in the Context of Administrative Proceedings**

In *Butz v. Economou*, 438 U.S. 478 (1978), the Supreme Court extended absolute

immunity to agency officials who perform adjudicative or prosecutorial functions in

certain administrative proceedings. In that case, the owner of a regulated business sued

federal officials for damages, alleging that the officials instituted a proceeding to revoke

or suspend the business's registration in retaliation for the business owner's criticisms of

the agency. *Id.* at 480-81. The Court granted certiorari amid conflicting decisions about

whether executive officials might claim absolute immunity. *See id.* at 483-85.

The Court explained that, although most officials are entitled to only a qualified

immunity when sued for constitutional violations, some officials perform "special

47

functions" that justify "a full exemption from liability." *Butz v. Economou*, 438 U.S. at 508. The Court observed that judges have absolute immunity because of the "special nature of their responsibilities" (*id.* at 511), while prosecutors have absolute immunity because they make decisions with "functional comparability" to the decisions of judges. *Id.* at 512. The Court explained that the "characteristics of the judicial process" make its participants the frequent targets of retaliatory litigation, creating a strong need "to assure that judges, advocates, and witnesses can perform their respective functions without harassment or intimidation." *Id.*

"At the same time," the Court observed that "safeguards built into the judicial process tend to reduce the need for private damages actions as a means of controlling unconstitutional conduct." *Butz v. Economou*, 438 U.S. at 512. The Court mentioned that judges are restrained by "insulation . . . from political influence, the importance of precedent in resolving controversies, the adversary nature of the process, and the correctability of error on appeal[.]" *Id.* Prosecutors, in their roles as "[a]dvocates[,]" are restrained by their "professional obligations" and by the "knowledge that their assertions will be contested by their adversaries in open court." *Id.*

The Court concluded that "adjudication within a federal administrative agency shares enough of the characteristics of the judicial process that those who participate in such adjudication should also be immune from suits for damages." *Butz v. Economou*, 438 U.S. at 512-13. The Court noted that agencies resolve conflicts "every bit as fractious as those which come to court" and are subject to "many of the same safeguards [that] are available in the judicial process." *Id.* at 513. "In light of these safeguards," the

48

Court decided that "the risk of an unconstitutional act by one presiding at an agency hearing is clearly outweighed by the importance of preserving the independent judgment of these men and women." *Id.* at 514. Accordingly, the Court held that "persons subject to these restraints and performing adjudicatory functions within a federal agency are entitled to absolute immunity from damages liability for their judicial acts." *Id.*

The Court further concluded that "agency officials performing certain functions analogous to those of a prosecutor" should have absolute immunity from suits for damages. *Butz v. Economou*, 438 U.S. at 515. The Court likened the "decision to initiate administrative proceedings" to a prosecutor's "decision to initiate or move forward with a criminal prosecution." *Id.* Similarly, the Court saw "no substantial difference between the function of the agency attorney in presenting evidence in an agency hearing and the function of a prosecutor who brings evidence before a court." *Id.* at 516. Thus, "officials who are responsible for the decision to initiate or continue a proceeding subject to agency adjudication" (*id.*) and "agency attorney[s] who arrange[] for the presentation of evidence on the record in the course of an adjudication" are absolutely immune from suits based on the performance of those duties. *Id.* at 517.

Although *Butz v. Economou* arose from a so-called *Bivens* action[15] alleging unconstitutional conduct of federal officials, the Court opined that it is "untenable to draw a distinction for purposes of immunity law between suits brought against state

---

[15] *See generally Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). In *Bivens* the Supreme Court "created a cause of action to redress a federal official's violation of a [federal] constitutional right." *Dehn Motor Sales, LLC v. Schultz*, 439 Md. 460, 490 n.31 (2014).

officials under § 1983 and suits brought directly under the Constitution against federal officials." *Butz v. Economou*, 438 U.S. at 504. Thus, *Butz v. Economou* governs the analysis of whether a state official has absolute immunity from a § 1983 claim based on a function in a state administrative proceeding.

C.      **Absolute Immunity in Relation to Medical Disciplinary Proceedings**

Absolute immunity for agency officials has become known as a form of "quasi-judicial" immunity. Over the past few decades, the federal circuit courts of appeal have comprehensively analyzed the absolute immunity of state officials in 42 U.S.C. § 1983 actions arising out of conduct in the proceedings of medical licensing and disciplinary boards.

In this context, courts hold that an official has absolute immunity based on the performance of a discretionary function if: (1) the function is analogous to a function in a judicial proceeding for which a judge or prosecutor enjoys absolute immunity; (2) the official's actions could potentially expose the official to frequent damages lawsuits unless the official had absolute immunity; and (3) the function occurs within a regulatory framework with safeguards sufficient to minimize the risk of unconstitutional acts. *E.g. Guttman v. Khalsa*, 446 F.3d 1027, 1033-34 (10th Cir. 2006) (citing *Horwitz v. State Bd. of Med. Examiners of State of Colorado*, 822 F.2d 1508, 1513 (10th Cir. 1987)).

Other courts have approached the issue by examining a list of non-exclusive "factors," none of which is necessarily controlling. *E.g. Olsen v. Idaho State Bd. of Medicine*, 363 F.3d 916, 923-24 (9th Cir. 2004) (citing *Mishler v. Clift*, 191 F.3d 998, 1009 (9th Cir. 1999)). Those factors are: "(a) the need to assure that the individual can

50

perform his [or her] functions without harassment or intimidation; (b) the presence of safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct; (c) insulation from political influence; (d) the importance of precedent; (e) the adversary nature of the process; and (f) the correctability of error on appeal." *Cleavinger v. Saxner*, 474 U.S. 193, 202 (1985) (citing *Butz v. Economou*, 438 U.S. 478, 512 (1978)).

Under either rubric, courts have consistently concluded that members of a state medical board who adjudicate disciplinary charges are functionally comparable to judges. Board members typically do not have the degree of insulation from outside influence that characterizes a judge or professional hearing examiner, but they have independence to the extent that they serve fixed terms during which they may not be removed at will. *See, e.g.*, *Watts v. Burkhart*, 978 F.2d 269, 275-76 (6th Cir. 1992). In disciplinary hearings, medical boards exercise the powers of trial judges, including the powers to compel the attendance of witnesses, to administer oaths, and to make evidentiary rulings. *See, e.g.*, *O'Neal v. Mississippi Bd. of Nursing*, 113 F.3d 62, 66 (5th Cir. 1997). Most importantly, boards perform the core adjudicative tasks of making factual findings, reaching legal conclusions, determining sanctions, and issuing orders and decisions. *See, e.g.*, *Coggeshall v. Massachusetts Bd. of Registration of Psychologists*, 604 F.3d 658, 663 (1st Cir. 2010) (citing *Bettencourt v. Bd. of Registration in Medicine of Commonwealth of Massachusetts*, 904 F.2d 772, 783 (1st Cir. 1990)).

Courts uniformly agree that controversies over the licensing and discipline of medical professionals are weighty enough to inspire retaliatory lawsuits. State medical

boards "make difficult and controversial decisions" affecting a person's career and livelihood. *O'Neal v. Mississippi Bd. of Nursing*, 113 F.3d at 66. It is "only natural" for the person affected by the decision to "want some kind of redress." *Id.* "In view of the public interest of assuring quality health care" (*Mishler v. Clift*, 191 F.3d at 1005), there is a corresponding interest in ensuring that board members can decide these matters "free from the threat of incurring personal liability for every decision they hand down." *O'Neal v. Mississippi Bd. of Nursing*, 113 F.3d at 66.

State medical practice acts usually afford procedural rights (such as notice of charges, representation through counsel, and the opportunity to present evidence and cross-examine witnesses) equivalent to those available under federal administrative law. *See, e.g.*, *Watts v. Burkhart*, 978 F.2d at 275. Consequently, medical disciplinary proceedings tend to be "inherently adversarial." *O'Neal v. Mississippi Bd. of Nursing*, 113 F.3d at 66. The board compiles a record and issues its decision in writing, so that a court may review the decision and correct any errors. *See, e.g.*, *Mishler v. Clift*, 191 F.3d at 1007. "These and other safeguards indicate that enough checks on malicious action by Board members exist to warrant a grant of absolute immunity for the Board members' actions in their adjudicatory capacities." *Bettencourt v. Bd. of Registration in Medicine of Commonwealth of Massachusetts*, 904 F.2d at 783.

In connection with these quasi-judicial proceedings, officials who perform prosecutorial functions are "equally entitled to absolute immunity." *Guttman v. Khalsa*, 446 F.3d at 1034. Consequently, an administrative prosecutor in a medical disciplinary proceeding is absolutely immune from a § 1983 suit for damages based on functions such

52

as the initiation of charges and the presentation of evidence. *See id.* To decide whether a function is prosecutorial, "the determinative factor is 'advocacy' because that is the prosecutor's main function and the one most akin to his [or her] quasi-judicial role." *Pfeiffer v. Hartford Fire Ins. Co.*, 929 F.2d 1484, 1490 (10th Cir. 1991) (citation and quotation marks omitted).

Overwhelmingly, these federal cases demonstrate that officials who perform adjudicative or prosecutorial functions in state medical disciplinary proceedings have absolute immunity from being sued for damages under § 1983, as long as those proceedings are akin to adjudications under the federal Administrative Procedure Act.

D.      **Absolute Immunity for Medical Disciplinary Proceedings in Maryland**

Proceedings of the State Board of Physicians are governed by the Medical Practice Act, HO §§ 14-101 through 14-702; and the Maryland Administrative Procedure Act, SG §§ 10-201 through 10-226. This regulatory framework is largely indistinguishable from the many out-of-state counterparts for which officials have absolute immunity from being sued for damages under § 1983.

Both the Board and the Office of Administrative Hearings, to which the Board delegates some of its authority, have structural independence. *See* HO § 14-202(i), (k); SG § 9-1605(a), (b). Board members and administrative law judges exercise judge-like powers during disciplinary hearings. *See* HO §§ 14-206(a), (b), 14-401(i); SG § 9-1605(c), (d). Together, they make findings of fact, reach conclusions of law, and decide the ultimate disposition. *See* HO § 14-405(e); SG §§ 10-220, 10-221. The contested-case provisions of the Maryland Administrative Procedure Act afford an adversarial

53

setting in which the respondent, through counsel, may dispute the charges. *See* HO § 14-405; SG § 10-213. Errors, including constitutional errors, may be corrected through judicial review and through further appellate review. *See* HO § 14-408; SG § 10-222.[16]

The defendants rely on *Ostrzenski v. Seigel*, 177 F.3d 245 (4th Cir. 1999), which determined that a defendant had absolute immunity from a § 1983 claim based on conduct in a proceeding under the Maryland Medical Practice Act. There, the Board (under its former name, the Board of Physician Quality Assurance) had commissioned peer review reports to determine whether to issue charges against a surgeon. *Id.* at 248. The surgeon sued one of the peer reviewers under § 1983, alleging the deprivation of constitutional rights through irregularities in the peer review process. *Id.* at 247-48. The trial court dismissed that claim on the ground of absolute immunity (*id.* at 248), and the Fourth Circuit upheld that conclusion. *Id.* at 253.

The Fourth Circuit observed: "Every court of appeals that has addressed the issue has concluded that members of a state medical disciplinary board are entitled to absolute quasi-judicial immunity for performing judicial or prosecutorial functions." *Ostrzenski v. Seigel*, 177 F.3d at 249 (collecting cases). The Court reasoned that, even though the peer reviewer was "not a Board member, and thus he [was] one step removed from the

---

[16] The Administrative Procedure Act authorized the court to "reverse or modify a decision if any substantial right of the petitioner may have been prejudiced because a finding, conclusion, or decision: (i) is unconstitutional; (ii) exceeds the statutory authority or jurisdiction of the final decision maker; (iii) results from an unlawful procedure; (iv) is affected by any other error of law; (v) is unsupported by competent, material, and substantial evidence in light of the entire record as submitted; or (vi) is arbitrary or capricious." SG § 10-222(h)(3).

'judicial' functions of the Board, he nevertheless [would] be entitled to absolute quasi-judicial immunity if he [was] engaged in a protected prosecutorial function." *Id.*

The Fourth Circuit compared the role of the peer reviewer deciding whether to recommend disciplinary charges to the role of "a prosecutor reviewing the evidence to determine whether to recommend prosecution." *Ostrzenski v. Seigel*, 177 F.3d at 250. Given the "real risk" of retaliatory lawsuits by physicians (*id.* at 250-51), the Court recognized a "strong need to ensure that peer reviewers perform their functions for the public good without harassment and intimidation." *Id.* at 250. Finally, the Court identified "adequate procedural safeguards" under Maryland administrative law "to protect against unconstitutional conduct by peer reviewers without reliance on private damages lawsuits." *Id.* at 251. Thus, the peer reviewer was absolutely immune from the § 1983 claim based on his prosecutorial role in the disciplinary proceedings. *Id.*

In view of *Ostrzenski v. Seigel* and other federal authorities, there is no reason to doubt that Board members would have absolute immunity if the Geiers had sued them under § 1983 to recover damages resulting from the decisions to issue charges against the Geiers, to revoke Dr. Geier's medical license, and to impose a penalty against David Geier. Those discretionary decisions were "directly related to th[e] adjudicatory function and the ultimate resolution of the disciplinary dispute[.]" *Olsen v. Idaho State Bd. of Medicine*, 363 F.3d 916, 928 (9th Cir. 2004). The remedy for any unconstitutionality in those decisions was to seek judicial review, as Dr. Geier and his son did. Their remedy was not to sue the decision makers for damages.

This absolute immunity would reach even the Board's decision to summarily

55

suspend Dr. Geier's license, which occurred on an ex parte basis, before he received notice and the opportunity to challenge the suspension. In Maryland, as in other states, summary suspensions entail substantially fewer protections than those available in ordinary disciplinary hearings. Courts have concluded, however, that "the exercise of summary suspension authority . . . is 'directly comparable to the function performed by a judge in deciding whether to issue a temporary restraining order or preliminary injunction.'" *Buckwalter v. Nevada Bd. of Med. Examiners*, 678 F.3d 737, 745-46 (9th Cir. 2012) (quoting *Watts v. Burkhart*, 978 F.2d 269, 277 (6th Cir. 1992)).[17] The summary suspension of a medical license "is nothing more than a temporary expedient" (*Watts v. Burkhart*, 978 F.2d at 276), followed promptly by an adversarial hearing "with a full complement of procedural safeguards." *Buckwalter v. Nevada Bd. of Med. Examiners*, 678 F.3d at 743.[18]

The defendants appear to argue that, because the underlying proceedings against Dr. Geier were "quasi-judicial" in nature, then absolute immunity should cover *all* actions of Board personnel in relation to those proceedings. That suggestion is too broad. Courts applying *Butz v. Economou* in similar contexts have analyzed the precise functions at issue in the plaintiff's claim. The § 1983 claim here concerns the drafting

---

[17] Absolute judicial immunity bars a § 1983 suit for damages against a state judge based on the act of issuing an injunction. *See Dennis v. Sparks*, 449 U.S. 24, 27 (1980).

[18] Maryland's summary suspension procedures are unlike those examined in *DiBlasio v. Novello*, 344 F.3d 292 (2d Cir. 2003), which vested a single commissioner with "virtually unfettered authority to determine whether a physician's license should be summarily suspended pending resolution of misconduct charges" and "provide[d] no meaningful review of the summary suspension[.]" *Id.* at 299.

and issuing of the cease-and-desist order dated January 25, 2012. We must examine whether those specific functions give rise to absolute immunity.

### E. Absolute Immunity for the Issuance of a Cease-and-Desist Order

The Geiers' main allegations are that the Board members intentionally included private information in the cease-and-desist order and improperly designated the order as a public document, resulting in its online publication. The Geiers make two arguments pertinent to whether, under federal law, the Board members have absolute immunity from the § 1983 claim based on their involvement with the order. The Geiers dispute whether issuing a cease-and-desist order is sufficiently analogous to a judicial function for absolute immunity to attach. They also dispute whether adequate safeguards exist to protect against unlawful conduct by the Board personnel. The Geiers have not denied that a strong need exists for Board personnel to "undertake their core public protection function without the constant threat of harassment and intimidation by aggrieved parties." *Maryland Bd. of Physicians v. Geier* ("*Geier II*"), 451 Md. 526, 569 (2017) (discussing deliberative privilege).

In the circuit court, the Geiers questioned whether the Board's decision to issue a cease-and-desist order requires the "exercise of judgment vital to the judiciary[.]" *Antoine v. Byers & Anderson, Inc.*, 508 U.S. 429, 435 (1993). To the contrary, when the Board issues a cease-and-desist order, it performs the task of "'authoritatively adjudicating private rights.'" *Id.* at 436 (quoting *Burns v. Reed*, 500 U.S. 478, 500 (1991) (Scalia, J., concurring)). The order has injunctive qualities insofar as it prohibits specific conduct. Md. Rule 15-501(a) (defining an injunction as "an order mandating or

57

prohibiting a specified act"). Perhaps even more so than a summary suspension, the decision to issue a cease-and-desist order "is 'directly comparable to the function performed by a judge in deciding whether to issue a temporary restraining order or preliminary injunction.'" *Buckwalter v. Nevada Bd. of Med. Examiners*, 678 F.3d 737, 745-46 (9th Cir. 2012) (quoting *Watts v. Burkhart*, 978 F.2d 269, 277 (6th Cir. 1992)).

The only federal circuit court called upon to decide the issue held that members of a state medical board were absolutely immune from a § 1983 claim based on the decision to order a person to cease and desist from the unauthorized practice of medicine. *Dunham v. Wadley*, 195 F.3d 1007 (8th Cir. 1999). In that case, a state veterinary board determined, after deliberating on investigation reports, that a doctor was practicing veterinary medicine in the state without a license. *Id.* at 1008-10. The board "issued orders in the form of letters sent to [the doctor] and two of her employers informing them of the board's conclusion that [the doctor] was engaging in the practice of veterinary medicine without a proper license, and warning that the employers themselves would be subject to criminal punishment if they did not 'cease and desist' from their employment of her." *Id.* at 1010-11. The Eighth Circuit reasoned that, "[t]o the extent that the board weighed evidence, made factual determinations, determined sanctions, and issued written decisions," the duties performed by the board were "functionally comparable to the duties performed by courts." *Id.* at 1011.

At a minimum, the decision to order a person to cease and desist from the unlicensed practice of medicine requires: some factual determination that the person is engaging in a particular activity, a legal conclusion that the activity constitutes the

58

unlicensed practice of medicine, and a choice that ordering the person to cease and desist is an appropriate course of action. The Medical Practice Act entrusted these matters to the Board's discretion. Among its other express grants of power, it stated: "The Board *may* issue a cease and desist order or obtain injunctive relief for practicing medicine without a license." HO § 14-206(e) (emphasis added). More generally, the Act authorized the Board to "[t]ake any appropriate and immediate action as necessary" after a preliminary investigation. HO § 14-401(c)(1)(ii). As the Court of Appeals observed: "The General Assembly clearly intended to afford [Board members] considerable discretion in carrying out their duties under the Health Occupations Article, including the express authority to issue cease and desist orders." *Geier II*, 451 Md. at 569-70.

The governing regulations further demonstrate that the Board's decision to issue a cease-and-desist order occurs alongside decisions to issue formal charges or sanctions. COMAR 10.32.02.03(C)(1) listed the "determination to . . . [i]ssue a cease and desist order" as one of several options for the Board to take "[a]fter reviewing the completed investigatory information and reports[.]" Other options included charging the respondent with a violation of the Act or dismissing the matter altogether. *Id.* Another regulation stated that, "[d]uring the course of the investigation of [a] complaint" of the unauthorized practice of medicine, "the Board *may* issue a nonpublic cease and desist order." COMAR 10.32.02.06(B)(2) (emphasis added). It specified: "At the conclusion of an evidentiary hearing, the administrative law judge may recommend a public cease and desist order in addition to a penalty." *Id.*

The Geiers have consistently argued that the Board violated these regulations by

issuing the cease-and-desist order as a public document during an ongoing investigation. They also assert that the inclusion of patient prescription information in the order violated Maryland law protecting the confidentiality of medical records. On those bases, they contend that "the publication of the document was illegal" and, in their view, the type of "ministerial act" that is undeserving of absolute immunity. Their argument misconceives the concept of a ministerial act.

Examples of ministerial acts include: a medical board's response to an out-of-state inquiry regarding a physician's standing to practice medicine (*Mishler v. Clift*, 191 F.3d 998, 1001, 1008 (9th Cir. 1999)); and a medical board's issuance of a billing statement for a public records request (*Olsen v. Idaho State Bd. of Medicine*, 363 F.3d 916, 928 (9th Cir. 2004)). A discretionary decision does not become a non-discretionary one if the discretion is exercised in less-than-full compliance with all legal requirements. *See Mishler v. Clift*, 191 F.3d at 1006 ("acts of the [medical board] are no less judicial or prosecutorial because they may have been committed in error"). If the law were otherwise, any plaintiff could overcome absolute immunity simply by alleging the violation of a statute or regulation.

Yet only a showing that adjudicators were "not acting in [their] judicial capacit[ies] or that [they] acted in the complete absence of all jurisdiction can overcome [their] absolute immunity." *Guttman v. Khalsa*, 446 F.3d 1027, 1034 (10th Cir. 2006) (citing *Mireles v. Waco*, 502 U.S. 9, 12 (1991) (per curiam)). A regulation restricting the Board's authority to make its orders public or a statute protecting patient confidentiality, however important it may be, does not limit the Board's jurisdiction over the unlicensed

60

practice of medicine.  Notwithstanding any arguments about the propriety of the order, "there can be absolutely no question of the board's jurisdiction" to issue the order, and as long as judicial officers have jurisdiction over the subject matter before them, they are "'absolutely immune from liability for [their] judicial acts even if [their] exercise of authority is flawed by the commission of grave procedural errors.'"  *Watts v. Burkhart*, 978 F.2d at 277 (quoting *Stump v. Sparkman*, 435 U.S. 349, 359 (1978)).

The regulations in effect when the Board issued the cease-and-desist order provided Dr. Geier with "ample opportunity to challenge the legality" (*Butz v. Economou*, 438 U.S. 478, 515 (1978)) of the order.  The order itself informed Dr. Geier of his right to challenge the order under the Board's regulations.  COMAR 10.32.02.09 provided: "When the Board issues a cease and desist order as a result of an investigation by the Board, and the respondent either challenges this order or violates the order, the matter is adjudicated according to Regulation .03 of this chapter."  The cross-referenced regulation set forth the procedures for the adjudication of formal disciplinary charges.  It outlined the rights to have representation by counsel, to request an evidentiary hearing governed by the Administrative Procedure Act, to take discovery, to take exceptions with the Board, and to seek judicial review of the final decision.  *See* COMAR 10.32.02.03(D)-(H).  Because these regulations required a challenge to a cease-and-desist order to be heard under the Administrative Procedure Act, the challenge would qualify as a "contested case" under that Act.  *See* SG § 10-202(d).

The Geiers take no issue with the assertion that Dr. Geier "had adequate due process protection available to him in the administrative proceedings, including the right

to file appeals." They argue that none of the available procedures "would have prevented the harm" that resulted from the Board's decision to include confidential patient information in a public document. In particular, they argue that the procedures available to Dr. Geier would not have protected the interests of his patients, David Geier and Anne Geier.[19] Their point is well-taken. Yet any number of plaintiffs denied recovery under the doctrine of quasi-judicial immunity (such as the business owner targeted by federal regulators in *Butz v. Economou*) might identify harms that were fully realized before those plaintiffs had the opportunity for redress.

To establish absolute quasi-judicial immunity, a defendant need not show that a specific procedure would have prevented all types of harm or the particular harm that the plaintiff alleges to have suffered. The doctrine rests on generalizations that "safeguards built into the judicial process tend to reduce the need for private damages actions" (*Butz v. Economou*, 438 U.S. at 512), and that certain agency proceedings share "enough of the characteristics of the judicial process" (*id.* at 513) that "the importance of preserving the independent judgment" of agency officials outweighs "the risk of an unconstitutional act" by an official. *Id.* at 514. The "correctability of error on appeal" is one factor in this analysis (*Cleavinger v. Saxner*, 474 U.S. 193, 202 (1985)), but the preventability of the

---

[19] It is not necessarily true that a patient harmed by a decision of the Board lacks any procedural rights. In a hearing of the Office of Administrative Hearings, "a person may be permitted to intervene . . . when the person . . . [c]laims an interest relating to the subject matter of the hearing that is: [] [a]dversely affected; and [] [n]ot adequately represented by existing parties." COMAR 28.02.01.15(a)(2). In addition, the circuit court may permit an interested person to intervene in an action for judicial review. SG § 10-222(d)(1).

alleged harm is not. "What matters for our purposes is that judicial review [was] available." *Buckwalter v. Nevada Bd. of Med. Examiners*, 678 F.3d at 744-45. The absence of a procedure to intercept an erroneous cease-and-desist order before it is issued "makes the consequences of an error by the Board more severe, but it has no bearing on whether the error [was] ultimately correctable." *Id.* at 744.

The Geiers have identified no feature of this case to set it apart from the many others in which absolute immunity protected members of a state medical board from a suit for damages under 42 U.S.C. § 1983.

### F. Absolute Immunity of Others Participating in the Board's Decision

The Geiers also named persons who were not Board members as defendants, but they make no separate argument about the immunity of those defendants. In any event, the immunity of those defendants largely rises and falls with the immunity of the Board members. Because absolute immunity attaches to functions rather than offices, it reaches not only medical board members but also support staff who perform functions closely related to the medical disciplinary process. *See Olsen v. Idaho State Bd. of Medicine*, 363 F.3d 916, 926 (9th Cir. 2004) (extending absolute immunity of board members to professional staff and counsel engaged in either adjudicative or prosecutorial functions); *O'Neal v. Mississippi Bd. of Nursing*, 113 F.3d 62, 66-67 (5th Cir. 1997) (same for executive director engaged in adjudicative functions); *Wang v. New Hampshire Bd. of Registration in Medicine*, 55 F.3d 698, 701 (1st Cir. 1995) (same for board counsel engaged in prosecutorial functions).

Here, the Geiers sued two directors and two staff members based on conduct

63

identical to that of the Board members. The complaint treated those defendants and the Board members "collectively" for pleading purposes. The complaint further alleged that one of those staff members (Mr. Schafer) "aided" and "participated" in the Board's decisions. To the extent that these defendants participated in the Board's decision, these defendants share the absolute immunity of the Board members. *See Bettencourt v. Bd. of Registration in Medicine of Commonwealth of Massachusetts*, 904 F.2d 772, 784-85 (1st Cir. 1990) (holding that staff members have absolute immunity for roles in assisting with the drafting of an order or in advising the board to impose sanctions).

The Geiers also sued the administrative prosecutor (Ms. Pepper) for her role in the "creation" of the order and the decision to make the order public. Even though a cease-and-desist order falls short of formal charges, an attorney also has absolute immunity with respect to preparatory steps needed to prosecute administrative charges. *See Pfeiffer v. Hartford Fire Ins. Co.*, 929 F.2d 1484, 1490-91 (10th Cir. 1991). Under the applicable regulations, a cease-and-desist order could be issued in lieu of charges or as a preliminary step before issuing formal charges. *See* COMAR 10.32.02.03(C)(1). Thus, an administrative prosecutor who advocates for the issuance of a cease-and-desist order "performs a function analogous to a prosecutor reviewing evidence to determine whether charges should be brought." *Ostrzenski v. Seigel*, 177 F.3d 245, 251 (4th Cir. 1999).[20] Moreover, unlike a prosecutor who disseminates information to the press outside of

---

[20] It is no coincidence that the January 2012 order directing Dr. Geier to cease and desist from the unlicensed practice of medicine was nearly identical to the formal charges issued in June 2012 upon the completion of the investigation.

agency proceedings (*cf. Pfeiffer v. Hartford Ins. Co.*, 929 F.2d at 1493), an administrative prosecutor acts within the role of an advocate by asking an agency to include a provision in an order.

Under federal law, all persons named as defendants in Count One enjoy absolute immunity from the claim under 42 U.S.C. § 1983. This immunity shields them from any liability for attorneys' fees under 42 U.S.C. § 1988. *See Supreme Court of Virginia v. Consumers Union of U.S., Inc.*, 446 U.S. 719, 738 (1980).

### III. Maryland Tort Claim Against Board Personnel and the Board

Thus far, this opinion has exclusively applied federal law to the claims for damages under 42 U.S.C. § 1983 and for attorneys' fees under 42 U.S.C. § 1988. The Geiers also prevailed on the tort claim for invasion of privacy through unreasonable publicity given to private life. Maryland law governs the issue of whether the defendants have immunity from that tort claim.

The parties offer irreconcilable interpretations of the governing law. The defendants contend that Maryland common law fully recognizes absolute immunity for agency officials who perform certain functions in administrative proceedings. The Geiers contend that both Maryland common law and Maryland statutes afford the defendants no more than a qualified immunity for actions taken without malice.

### A. Absolute Judicial (and Quasi-Judicial) Privilege Under Maryland Law

The defendants assert that the Court of Appeals has already granted absolute immunity in tort actions to officials who perform "adjudicatory or prosecutorial functions" in administrative proceedings. The defendants' argument relies on cases

65

concerning the testimonial privilege against claims of defamation. In so doing, the argument conflates doctrines that are closely related ("privilege" and "immunity"), but that remain conceptually distinct.

"For reasons of public policy, the law of defamation recognizes certain communications as privileged, and thereby affords those who publish such communications immunity from liability." *Miner v. Novotny*, 304 Md. 164, 167 (1985). Since 1888, the Court of Appeals has granted witnesses in judicial proceedings an absolute privilege to make defamatory statements in the course of litigation. *Keys v. Chrysler Credit Corp.*, 303 Md. 397, 403-04 (1985) (citing *Hunckel v. Voneiff*, 69 Md. 179 (1888); *Bartlett v. Christhilf*, 69 Md. 219 (1888)). This privilege is "absolute" in the sense that it defeats a defamation suit even if the defendant's "purpose or motive was malicious," even if the defendant "knew that the statement was false," and even if the defendant's "conduct was otherwise unreasonable." *Adams v. Peck*, 288 Md. 1, 3 (1980). The justification for this absolute privilege is that, for the judicial fact-finding process "to function effectively, those who participate must be able to do so without being hampered by the fear of private suits for defamation." *Id.* at 5. The holder of this privilege enjoys "complete immunity from suit" for a defamation claim based on the privileged statement. *Offen v. Brenner*, 402 Md. 191, 199 (2007).[21]

---

[21] "Maryland law is not settled" on the extent to which absolute privilege results in immunity outside of defamation cases. *Mixter v. Farmer*, 215 Md. App. 536, 547 (2013). The Court of Appeals recently applied the absolute litigation privilege to a claim for breach of a non-disparagement clause in a contract. *See O'Brien & Gere Engineers, Inc. v. City of Salisbury*, 447 Md. 394, 414 (2016).

Consistent with the Court's "'broad view' of the scope of th[is] privilege," the Court has extended it to statements made in connection with "administrative and other quasi-judicial proceedings." *Imperial v. Drapeau*, 351 Md. 38, 45 (1998) (quoting *Keys v. Chrysler Credit Corp.*, 303 Md. at 404). The authoritative Maryland precedent on absolute privilege outside of court proceedings is *Gersh v. Ambrose*, 291 Md. 188 (1981).

In that case, the plaintiff sued an Assistant State's Attorney for making slanderous statements while testifying at a public hearing of the Baltimore City Community Relations Commission. *Gersh v. Ambrose*, 291 Md. at 189. Chiefly, the Court followed the reasoning of an English defamation case, *Trapp v. Mackie*, 1 All E.R. 489 (1979), 1 W.L.R. 377 (H.L. 1978), which extended the absolute privilege to a witness in an administrative proceeding based on the rationale that the "cumulative effect of the safeguards which attended the proceedings was such that the public interest sought to be advanced by providing the immunity clearly outweighed the harm of subjecting the [defamed] individual to possible legal injury without remedy." *Gersh v. Ambrose*, 291 Md. at 196. On the record before it, by contrast, the Court determined that the public benefit from testimony at the hearing of the Community Relations Commission was "not sufficiently compelling to outweigh the possible damage to individual reputations to warrant absolute witness immunity." *Id*.

Going forward, the Court announced: "whether *absolute witness immunity* will be extended to any administrative proceeding will have to be decided on a case-by-case basis and will in large part turn on two factors: (1) the nature of the public function of the proceeding and (2) the adequacy of procedural safeguards which will minimize the

occurrence of defamatory statements." *Gersh v. Ambrose*, 291 Md. at 197 (emphasis added). These two factors remain the definitive standard for deciding whether statements made in connection with a quasi-judicial proceeding are absolutely privileged under Maryland law. *See generally Norman v. Borison*, 418 Md. 630, 652-60 (2011).

The defendants assert that in *Odyniec v. Schneider*, 322 Md. 520, 528-29 (1991), "the Court of Appeals . . . held that where . . . an administrative scheme affords procedural safeguards, officials performing adjudicatory or prosecutorial functions . . . are 'immune from suits for damages.'" The actual holding of that case is that certain statements made to a patient, by an expert witness in a health claims arbitration proceeding, during a medical examination in preparation for the witness's participation in the proceeding, were absolutely privileged in a defamation action. *Odyniec v. Schneider*, 322 Md. at 534-35. The relevant portions of the *Gersh* and *Odyniec* opinions concern a defendant's privilege as a witness, not whether a defendant was engaged in a protected adjudicatory or prosecutorial function. The sentence quoted by the defendants merely recounts that the *Gersh* opinion cited *Butz v. Economou* "[b]y way of example" (*Odyniec v. Schneider*, 322 Md. at 528), before explaining the Supreme Court's holding from that case.

The defendants ask this Court to follow one case that appears to have held that Maryland recognizes the doctrine of "absolute quasi-judicial immunity." As discussed previously, in *Ostrzenski v. Seigel*, 177 F.3d 245 (4th Cir. 1999), a surgeon sued a peer reviewer who prepared a report at the behest of the Board. In addition to the § 1983 claim (for which the peer reviewer had absolute immunity under federal law), the surgeon

68

raised a Maryland tort claim for false-light invasion of privacy, alleging that the peer reviewer knowingly reported false information to the Board. *Id.* at 248. The Fourth Circuit concluded that the peer reviewer was "entitled to absolute quasi-judicial immunity under Maryland law from [the] false light claim[,]" for the same reasons that the peer reviewer was "absolutely immune from liability for damages under § 1983[.]" *Id.* at 253. The Fourth Circuit stated: "Maryland law recognizes absolute immunity in quasi-judicial administrative proceedings when the nature of the public function of the proceedings is sufficiently compelling and procedural safeguards are adequate to minimize the potential for injury at the hands of the immunized official." *Id.* (citing *Odyniec v. Schneider*, 322 Md. at 528-29; *Gersh v. Ambrose*, 291 Md. at 196-97).

Although we might agree with the outcome reached by the Fourth Circuit, we are unpersuaded by any suggestion that the "immunity" discussed in *Gersh v. Ambrose* is identical to the immunity established by *Butz v. Economou*. The use of shared terminology can be a source of confusion. As the Court of Appeals has noted, "the terms 'privilege' and 'immunity' are often used interchangeably[,]" because "[t]o the extent there is a privilege, immunity from liability tends to follow." *Smith v. Danielczyk*, 400 Md. 98, 103 n.1 (2007). Despite this overlap, the decisions that immunize persons for privileged statements have remained distinct from the decisions that immunize officials for their performance of protected functions. *See Gill v. Ripley*, 352 Md. 754, 761-63 (1999) (comparing the various forms of immunity and privilege for participants in the judicial process). The *Gersh* opinion underscored this distinction by analyzing the defendant's "claim of immunity based upon his activities as Assistant State's Attorney"

apart from his second claim "based upon the undisputed fact that he was testifying as a witness before the Baltimore City Community Relations Commission[.]" *Gersh v. Ambrose*, 291 Md. at 190.

Quite overtly, the discussion of "procedural safeguards" in *Butz v. Economou*, 438 U.S. at 512, influenced the Court of Appeals' adoption of a similar factor in *Gersh v. Ambrose*, 291 Md. at 192-93. The two cases, however, do not employ the same balancing inquiry. The Supreme Court examined whether, "[i]n light of th[e] safeguards" available in an agency proceeding, the "importance of preserving the independent judgment" of the officials outweighs the "risk of an unconstitutional act" by an official. *Butz v. Economou*, 438 U.S. at 514. The *Gersh* factors seek to determine "from the nature and conduct of the proceeding" whether "society's benefit from unfettered speech during the proceeding" outweighs "the interests of an individual who might be defamed during that proceeding." *Odyniec v. Schneider*, 322 Md. at 531. In short, one doctrine immunizes officials for their acts, while the other immunizes all participants for their words.

The defendants seem to have arrived at a late realization that the "immunity" discussed in *Gersh v. Ambrose*, resulting from an absolute privilege to make defamatory statements, is distinct from the immunity established by *Butz v. Economou*.[22] Near the end of the immunity argument from their brief, they stated: "Additionally, there is an absolute privilege for statements made during judicial and quasi-judicial proceedings, . . .

---

[22] Counsel for the defendants acknowledged this distinction at oral argument.

[and] [a]ccordingly, statements in the order cannot serve as the basis for this lawsuit."

Even if the defendants did the bare minimum needed to raise the issue of absolute privilege in their appellate brief, nothing in their brief indicates that they raised the issue of absolute privilege in the circuit court or that the court ever decided that issue. The motion to dismiss did not mention absolute privilege. The summary judgment motion cited *Gersh v. Ambrose* and *Odyniec v. Schneider*, but only in support of an argument about the "quasi-judicial" nature of the Board's proceedings. Neither the Geiers nor the circuit court could reasonably have been expected to treat that motion as anything other than what it purported to be: a motion for summary judgment on the ground of "absolute quasi-judicial immunity." Under the circumstances, we will not consider the defendants' additional argument that statements published in the cease-and-desist order might qualify for the absolute privilege under *Gersh v. Ambrose*.

We will consider the argument that the defendants made throughout the case: that they have absolute immunity from suits based on their performance of adjudicatory and prosecutorial functions, under the principles of *Butz v. Economou*. The remaining question is whether Maryland law recognizes those same principles.

### B.     Absolute Immunity for Government Officials Under Maryland Law

As legislatures increasingly delegated judicial functions to administrative agencies throughout the twentieth century, those agencies "have come to . . . adjudicate more than courts" in "'contested cases affecting in varied ways the lives, health, fortunes, safety, labor, and the business of millions of citizens.'" *State Ins. Comm'r v. Nat'l Bureau of Cas. Underwriters*, 248 Md. 292, 299 (1967) (quoting 1 Frank E. Cooper, *State*

71

*Administrative Law* 1-2 (1965)).  More than a decade before *Butz v. Economou*, the Court

of Appeals declined to decide whether some state agency officials should have absolute

immunity from tort claims based on their roles in administrative hearings.  That issue

remains undecided.

In *Eliason v. Funk*, 233 Md. 351 (1964), a former state employee accused two

agency officials of wrongfully removing him from the state classified service.  *Id.* at 353-

54.  One official initiated charges against the employee; another official heard the charges

and decided to discharge him from employment.  *Id.* at 354-55.  At the administrative

hearing, the employee "was represented by counsel of his own choosing, witnesses were

regularly summoned, sworn and cross-examined, and the decision was appealed" in a

trial court.  *Id.* at 355.  The officials argued that they were immunized by an "absolute

privilege" for their acts.  *Id*. at 354.[23]

The Court of Appeals noted that "judges have an absolute privilege from suits

arising out of their judicial acts[,]" and that "[p]rosecutors in judicial hearings are

afforded the same privilege."  *Eliason v. Funk*, 233 Md. at 356.  The Court observed that

some courts had extended this privilege "to minor tribunals and to officers exercising

discretionary or quasi-judicial functions," while other courts had "extend[ed] the

---

[23] Older Maryland cases often use the term "privilege" in contexts where a court today would use the term "immunity."  The Court of Appeals has explained that "'immunity' is the more descriptive term" when the issue is whether an official "may be held civilly liable for damages for conduct that is allegedly wrongful—conduct which, if committed by someone else, would subject the person to such liability."  *Gill v. Ripley*, 352 Md. 754, 760 n.3 (1999).  "It is not really a 'privilege' to commit the wrongful conduct that the law recognizes, but rather an exemption from civil liability founded upon broader principles of public policy."  *Id.*

privilege only to actions taken in good faith, indicating that malicious actions would not be protected." *Id.* (citations omitted). The Court commented that "Maryland cases seem[ed] to indicate that discretionary action [would] be protected only in the absence of malice[,]" but added that the case before the Court was "much closer factually to the cases dealing with judicial actions, where there is a right to review, than to the discretionary acts of law enforcement officers." *Id.* It was unnecessary, however, for the Court to "hold that the privilege [was] absolute" in the case before it, because the plaintiff had failed to make sufficient allegations of malice. *Id.* at 357.

The Geiers appear to argue that Maryland common law completely forbids any immunity for malicious conduct by government officials. They quote language from cases involving alleged torts by firefighters and police officers. *E.g. James v. Prince George's County*, 288 Md. 315, 323-24 (1980) ("[o]nce it is established that the individual is a public official and the tort was committed while performing a duty which involves the exercise of discretion, a qualified immunity attaches; namely, in the absence of malice, the individual involved is free from liability"); *Robinson v. Bd. of County Comm'rs for Prince George's County*, 262 Md. 342, 347 (1971) ("when acting in a discretionary capacity public officials, to enjoy immunity, must act without malice").

Although absence of malice is still a requirement for "qualified public official immunity" (*see, e.g.*, *D'Aoust v. Diamond*, 424 Md. 549, 585-86 (2012)), it is no longer a requirement for all forms of immunity under Maryland tort law. In recent years, the Court has confirmed that "'*there are some officials whose special functions require a full exemption from liability*.'" *Mandel v. O'Hara*, 320 Md. 103, 119-20 (1990) (emphasis in

73

original) (quoting *Butz v. Economou*, 438 U.S. 478, 508 (1978)).

In *Mandel v. O'Hara*, 320 Md. at 104-05, the Court held, as a matter of Maryland common law, that officials are absolutely immune from civil liability for non-constitutional torts based on the performance of legislative functions. In that case, former Governor Marvin Mandel contended that he was entitled to absolute immunity in an action for common-law deceit based on the allegation that he vetoed a bill as part of a conspiracy to depress a stock price for the benefit of his alleged co-conspirators. *Id.* at 106-07. The Court explained that, unlike the qualified immunity available to most public officials, an "absolute immunity from tort liability 'stands even if the official acts in bad faith, or with malice or corrupt motives.'" *Id.* at 107 (quoting *Prosser & Keeton on Torts* § 132, at 1057 (5th ed. 1984)).

The purpose of affording an absolute immunity "'is to free the officer from the necessity of submitting [the officer's] purposes, motives[,] and beliefs to the uncertain appraisal of juries or even judges.'" *Mandel v. O'Hara*, 320 Md. at 107 (quoting Restatement (Second) of Torts § 895D, cmt. c (1977)). To describe the policy more fully, the Court quoted the following, frequently cited passage:

> "'It does indeed go without saying that an official, who is in fact guilty of using his powers to vent his spleen upon others, or for any other personal motive not connected with the public good, should not escape liability for the injuries he may so cause; and, if it were possible in practice to confine such complaints to the guilty, it would be monstrous to deny recovery. The justification for doing so is that it is impossible to know whether the claim is well founded until the case has been tried, and that to submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties. Again and again the public interest calls for

74

action which may turn out to be founded on a mistake, in the face of which an official may later find himself hard put to it to satisfy a jury of his good faith. There must indeed be means of punishing public officers who have been truant to their duties; but that is quite another matter from exposing such as have been honestly mistaken to suit by anyone who has suffered from their errors. As is so often the case, the answer must be found in a balance between the evils inevitable in either alternative. In this instance it has been thought in the end better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation . . . .

*Mandel v. O'Hara*, 320 Md. at 115 (quoting *Barr v. Matteo*, 360 U.S. 564, 571-72 (1959) (plurality opinion) (quoting *Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir. 1949) (per L. Hand, C.J.))).

The Court of Appeals observed that its prior decisions on the immunity of public officials "neither compel[led] nor foreclose[d] the conclusion" that the former governor possessed absolute immunity. *Mandel v. O'Hara*, 320 Md. at 108. For guidance, the Court looked to Supreme Court decisions on absolute immunity in § 1983 cases, which are intended to be "'in harmony with general principles of tort immunities and defenses rather than in derogation of them.'" *Id.* at 113 (quoting *Imbler v. Pachtman*, 424 U.S. 409, 418 (1976)). The Court reasoned that cases addressing the immunity of state or federal officials, in suits for alleged violations of the federal constitution under § 1983 or *Bivens*, "may be persuasive authority as to the Maryland common law of public official immunity in a state law, nonconstitutional tort action against a state official[.]" *Mandel v. O'Hara*, 320 Md. at 113.

From those cases, the Court derived the principles that "[j]udges, when performing judicial functions, and legislators, when performing legislative functions" enjoy absolute

immunity from federal claims, while officials in the executive department might enjoy absolute immunity depending on "the function which gives rise to the federal law claim." *Mandel v. O'Hara*, 320 Md. at 113. Employing the functional approach, the Court of Appeals concluded that a governor, even as the head of the executive branch, performs a legislative function in exercising the power to veto or approve legislation. *Id.* at 133-34. Thus, the former governor was entitled to the same absolute immunity based on his veto decision that members of state legislatures traditionally enjoyed for their votes for or against a bill. *Id.* at 134-35.

While the holding of *Mandel v. O'Hara* concerned legislative immunity, the reasoning of the opinion strongly suggested that judicial immunity is also a feature of Maryland law. The Court of Appeals fully embraced the doctrine of absolute judicial immunity when it decided *Parker v. State*, 337 Md. 271 (1995). The plaintiff, Parker, had been arrested for failing to pay a fine despite being acquitted of the traffic offense on which the fine was based. *Id.* at 274. She sued a circuit court judge under § 1983 for erroneously issuing the arrest warrant; she also sued the State, through the Maryland Tort Claims Act, based on the judge's conduct. *Id.* at 275. The Court of Appeals held that the doctrine of absolute judicial immunity required the dismissal of the claims "under either state or federal law, for issuing the warrant for Parker's arrest." *Id.* at 290-91.

The Court grounded its holding both in precedent and in policy. The Court explained that, "by the seventeenth and eighteenth centuries, a broad concept of absolute civil immunity for judicial acts had been firmly established" in the common law of England (*Parker v. State*, 337 Md. at 279), and that American courts "likewise

76

recognized the same broad principle" during the nineteenth century. *Id.* at 280. The Court observed that the "common law principle of absolute judicial immunity . . . has neither been abrogated nor been modified in Maryland." *Id.* at 283. The Court endorsed two main justifications for this principle: the need "to forestall endless collateral attacks on judgments through civil actions against the judges themselves"; and the availability of other "well-developed, institutionalized mechanisms . . . within the judicial system for correcting erroneous decisions made by judges." *Id.* at 287.

The Court held that, because the judge who issued the warrant for Parker's arrest performed a judicial act within the general scope of the court's jurisdiction, the judge was absolutely immune from Maryland tort claims based on that act. *Parker v. State*, 337 Md. at 287. Parker had conceded that she could not hold the State liable for the judge's actions if the judge was immune from suit. *Id.* at 277. The Court agreed, explaining that "a suit that is barred by judicial immunity cannot form the basis of a recovery against the State under the Tort Claims Act." *Id.* at 286. Observing that the Supreme Court continues to adhere to "traditional form" of judicial immunity in its § 1983 cases, the Court of Appeals further concluded that the judge was entitled to absolute immunity from the § 1983 claim. *Id.* at 289-90.

The Court of Appeals again employed the functional approach when it recognized absolute immunity for prosecutors and support staff in *Gill v. Ripley*, 352 Md. 754 (1999). The Court described the doctrine of prosecutorial immunity as a "relative latecomer" in American common law, which "arose initially as an adjunct" to the "more ancient" doctrine of judicial immunity. *Id.* at 760. The Court explained that judicial

77

immunity first covered judges, but later expanded to include other officials, including prosecutors, whose decisions are functionally comparable to those of judges. *Id.* at 761-62. The Court noted that, in "defining and applying judicial immunity, from which prosecutorial immunity arose and with which it maintains some affinity," the Court had "adopted the functional approach taken by the Supreme Court" in judicial immunity cases. *Id.* at 770. Seeing "no reason to depart from that approach[,]" the Court held that, "as a matter of Maryland common law, . . . prosecutors enjoy absolute immunity with respect to claims arising from their role in the judicial process[.]" *Id.*

The defendants asserting absolute immunity in that case included two state prosecutors who had litigated a paternity action on behalf of a child's mother, as well as a clerical employee in the State's Attorneys' Office. *Gill v. Ripley*, 352 Md. at 755-57. The mother sued the defendants for a variety of torts and alleged that they acted out of malice. *Id.* at 757-59. The Court reasoned that, just as "the decision to terminate a [criminal] prosecution . . . is a quasi-judicial function" and "therefore within the ambit of absolute prosecutorial immunity" (*id.* at 774), the prosecutor's function "becomes a quasi-judicial one" "once the decision is made to proceed against a particular individual" in a paternity proceeding. *Id.* at 780. Moreover, the clerical employee who acted "under the direction of the State's Attorney" and whose "conduct was directly and intimately involved with the prosecution" of the paternity action enjoyed the same immunity as the two prosecutors. *Id.* at 773.

Subsequent opinions have cemented into Maryland law the doctrine of judicial immunity and, more generally, the functional approach to absolute immunity. *See*

*Keller-Bee v. State*, 448 Md. 300, 305-08 (2016); *D'Aoust v. Diamond*, 424 Md. 549, 596-99 (2012).  The Court has continued to consult Supreme Court decisions on the absolute immunity of governmental officials in resolving questions about the scope of absolute immunity under Maryland law.  *E.g. Keller-Bee v. State*, 448 Md. at 310 (citing *Forrester v. White*, 484 U.S. 219, 229 (1988)); *D'Aoust v. Diamond*, 424 Md. at 598, 602 (citing *Forrester v. White*, 484 U.S. at 227).

Nevertheless, the Geiers are correct in asserting that the Court of Appeals has not yet adopted the doctrine of absolute quasi-judicial immunity.  "The occasion" for the Court "to consider that issue simply has not arisen."  *Mandel v. O'Hara*, 320 Md. at 109.

Contrary to the Geiers' suggestion, however, our inquiry does not simply end here.  The absence of a controlling decision on an issue does not absolve this Court (or a circuit court) of its duty to decide an issue before it.  Where there is no controlling Maryland precedent, opinions concerning the immunity of government officials in actions based on alleged violations of the federal constitution should be treated as persuasive authority as to the Maryland common law.  *Mandel v. O'Hara*, 320 Md. at 113; *accord Simms v. Constantine*, 113 Md. App. 291, 302-05 (1997).  The *Butz v. Economou* opinion, a venerable precedent followed by federal and state courts for the past four decades, certainly fits into this category.

At present, Maryland common law shares all doctrinal foundations of *Butz v. Economou*.  The Court of Appeals recognizes the doctrine of absolute judicial immunity in substantially the same form used by the Supreme Court, as both courts draw from the same far-reaching common-law tradition.  *See Parker v. State*, 337 Md. at 288-91.  The

policy considerations that support judicial immunity in this State are no different from the ones recognized by the Supreme Court. *Compare id.* at 286-87 (citing *Bradley v. Fisher*, 80 U.S. (13 Wall.) 335, 348 (1871)), *with Butz v. Economou*, 438 U.S. at 512. Likewise, the nature and scope of absolute prosecutorial immunity in Maryland is essentially equivalent to the federal counterpart on which it is based. *See Gill v. Ripley*, 352 Md. at 766-70 (discussing *Imbler v. Pachtman*, 424 U.S. 409 (1976); *Burns v. Reed*, 500 U.S. 478 (1991); and *Buckley v. Fitzsimmons*, 509 U.S. 259 (1993)).

"[I]n defining and applying judicial immunity," the Court of Appeals has "adopted the functional approach taken by the Supreme Court" in absolute immunity cases. *Gill v. Ripley*, 352 Md. at 770. This approach examines "'the nature of the function performed, not the identity of the actor who performed it[.]'" *Keller-Bee v. State*, 448 Md. at 310 (quoting *Forrester v. White*, 484 U.S. at 229). Maryland cases emphasize that, in deciding whether to extend judicial immunity beyond judges, a "critical determination" is whether the official "is exercising judgment similar to that of a judge." *D'Aoust v. Diamond*, 424 Md. at 598-99 (citing *Gill v. Ripley*, 352 Md. at 762 (quoting *Antoine v. Byers & Anderson, Inc.*, 508 U.S. 429, 436 (1993))). Finally, in the related context of absolute privilege in defamation actions, the Court of Appeals endorsed the basic logic of *Butz v. Economou*: "the immunity available in court trials c[an] safely be extended" to administrative adjudications, as long as the "the protections afforded in [the] adjudicatory hearing" are adequate to restrain unlawful acts. *Gersh v. Ambrose*, 291 Md. at 193.

Collectively, the Maryland cases recognizing absolute immunity in tort actions echo the reasoning of *Butz v. Economou*. It would be anomalous to accept each premise

80

of the Supreme Court's reasoning, but to deny the ultimate conclusion. The Geiers have failed to show that Maryland law is in conflict with *Butz v. Economou* or that the reasoning of that case is somehow faulty. Given how closely it conforms with Maryland law on absolute immunity, there is every reason to conclude that *Butz v. Economou* is more persuasive than any other authority on the question of whether an agency official has absolute immunity from suit in an action under Maryland law.

Accordingly, we hold that, under Maryland common law, state officials are absolutely immune from suit for common-law, nonconstitutional torts based on conduct for which those officials would enjoy absolute immunity under the principles stated in *Butz v. Economou*, 438 U.S. at 508-17.[24] One necessary modification is that, where the Supreme Court examined the existence of safeguards that "tend to reduce the need for private damages actions as a means of controlling unconstitutional conduct" (*id.* at 512), the state version of this doctrine examines whether the proceeding affords safeguards to control otherwise unlawful acts by agency officials. Despite that minor distinction, the same reasons for which the defendants have absolute immunity from the federal § 1983 claim compel the conclusion that they have absolute immunity from the Maryland tort claim.

---

[24] The Maryland cases on which we have relied involve ordinary, common-law torts. The Court of Appeals expressly limited its holding on absolute legislative immunity to "nonconstitutional torts." *Mandel v. O'Hara*, 320 Md. at 104, 134. In dicta, the Court has indicated that judicial immunity reaches tort claims for alleged violations of the Maryland Constitution. *See Parker v. State*, 337 Md. at 275 n.2. Because the Geiers did not allege violations of the Maryland Constitution, it is unnecessary to decide whether the defendants might have absolute immunity for constitutional torts.

Moreover, because the Board personnel were performing "governmental functions that cannot give rise to civil liability in tort[,]" the Geiers' suit "cannot form the basis of a recovery against the State under the Tort Claims Act." *Parker v. State*, 337 Md. at 286. None of defendants to this action can "be held civilly liable, under either state or federal law" (*id.* at 290-91) for issuing the cease-and-desist order.

### C. Qualified Immunity for Board Personnel Under Maryland Statutes

Generally, in addition to an immunity available under common law, "Maryland public officials may also claim immunity for their official acts on statutory grounds." *Houghton v. Forrest*, 412 Md. 578, 588 (2010). The parties here identify at least two statutes under which the defendants might claim immunity. Section 5-522(b) of the Courts and Judicial Proceedings Article grants "State personnel" an immunity from suit and from liability for torts committed "without malice or gross negligence" within the scope of their public duties. Section 5-715(b) of the Courts and Judicial Proceedings Article protects a "member" or "legally authorized agent of the Board" from civil liability for certain actions taken "without malice" when acting on a ground for Board action. The parties disagree over the implications of the latter statute.

This statute is the latest iteration of a provision first enacted in 1976. The original legislation created two new subsections within the Code section that governed the Commission on Medical Discipline. One subsection prohibited the "records of any proceeding before the Commission or of any of its investigatory bodies or any order passed by the Commission" from being admitted into evidence in court proceedings without the consent of all parties. 1976 Md. Laws ch. 601, § 1 (creating § 130(q) of

82

Article 43 of the Maryland Code).  The subsection relating to liability read as follows:

> (r) A member of the Commission and any person who makes a complaint to the Commission or who investigates or prosecutes the complaint on its behalf is not liable to any person in any civil proceeding on account of having made the complaint, investigated the complaint, prosecuted the complaint, heard the complaint or acted upon the complaint, provided that such member or other person enumerated herein did not act with malice.

1976 Md. Laws ch. 601, § 1 (creating § 130(r) of Article 43 of the Maryland Code).

Since its enactment, the immunity provision has been reworded and renumbered several times, without any indication of an intent to change its scope.  The first such amendment occurred when the General Assembly recodified existing laws into the new Health Occupations Article.  *See* 1981 Md. Laws ch. 8.  In the process, the legislature relocated the immunity provision into its own separate section.  The Revisor's Note explained that the language was "derived without substantive change" from its source.

In 1988, the General Assembly created the State Board of Physician Quality Assurance to assume the duties formerly vested in the Commission on Medical Discipline.  *See* 1988 Md. Laws ch. 109.  In the immunity section, the legislature simply substituted the word "Board" for the word "Commission."

By Chapter 546 of the Laws of 1990, the General Assembly consolidated dozens of code provisions concerning "Immunities, Limitations on Liability, and Prohibited Actions" into a new subtitle of the Courts and Judicial Proceedings Article.  This legislation relocated the substance of the immunity provision to a newly-created section, grouping it with similar statutes.  At the same time, it amended the relevant section of the Health Occupations Article to refer to the new section.

Annual corrective bills renumbered the respective sections of the Health

Occupations Article and the Courts and Judicial Proceedings Article. *See* 1990 Md.

Laws ch. 6, § 11; 1997 Md. Laws ch. 14, § 9. Another minor change resulted when the

legislature renamed the Board of Physician Quality Assurance as the Board of

Physicians. *See* 2003 Md. Laws ch. 252, § 10.

At all times relevant to this case, the statute was identical to its current form. At

present, § 14-412(a) of the Health Occupations Article states:

> (a) If a person is a member of the Board or a legally authorized agent of the
> Board and is investigating, prosecuting, participating in a hearing, or
> otherwise acting on an allegation of a ground for Board action made to the
> Board or the Faculty, the person shall have the immunity from liability
> described under § 5-715(b) of the Courts and Judicial Proceedings Article.

The cross-referenced provision states:

> (b) A person who acts without malice and is a member of the Board or a
> legally authorized agent of the Board, is not civilly liable for investigating,
> prosecuting, participating in a hearing under § 14-405 of the Health
> Occupations Article,[25] or otherwise acting on an allegation of a ground for
> Board action made to the Board or the Faculty.

Md. Code (1974, 2013 Repl. Vol.), § 5-715(b) of the Courts and Judicial Proceedings

Article.

In the circuit court, the Geiers argued that this statute, by granting immunity for

---

[25] Section 14-405 of the Health Occupations Article governs formal disciplinary hearings in accordance with the Administrative Procedure Act against licensed physicians. The Board's decision to issue a cease-and-desist order against Dr. Geier occurred outside of that hearing process. The act of issuing a cease-and-desist order is nevertheless covered by the phrase "otherwise acting on an allegation of a ground for Board action[.]" Md. Code (1974, 2013 Repl. Vol.), § 5-715(b) of the Courts and Judicial Proceedings Article.

actions taken without malice, supplants any common-law doctrine that might grant Board members and agents an immunity for acts taken with malice. The defendants argued that this statute supplements whatever other immunities might be available under common law or other statutes.

A purely literal reading of the statutory language supports the defendants' interpretation. Malice makes a person ineligible for the protection of the statute, but the statute does not purport to restrict a person from avoiding liability on some other basis. The Geiers' proposed interpretation does not contradict the language of the statute, but it requires at least some inference beyond what is literally expressed: that the persons protected by the statute have *only* the immunity granted by the statute when they perform the acts described in the statute. Normally, courts refrain from adding words to a statute to give it a meaning not expressed by the legislature. *See, e.g.*, *Lillian C. Blentlinger, LLC v. Cleanwater Linganore, Inc.*, 456 Md. 272, 308 (2017).

Although courts sometimes consult extrinsic materials as supplemental aids for statutory interpretation (*see, e.g.*, *Blackstone v. Sharma*, 461 Md. 87, 113-14 (2018)), the relevant materials here express almost nothing not expressed by the text. The title of the 1976 enactment was simply: "An ACT concerning Commission on Medical Discipline." The stated purposes were "prohibiting the admission of certain records of the Commission" and "providing that certain persons, under certain conditions, are not liable in any civil proceeding." 1976 Md. Laws ch. 601, preamble. The bill file shows that the bill received a favorable committee vote and that the Senate approved one floor amendment, unrelated to the provision on civil liability. Later amendments contribute

little to the analysis because those amendments were not substantive.

Another potentially relevant tool of interpretation is the general presumption that the General Assembly acts with full knowledge of existing law. *See, e.g.*, *Montgomery County v. Robinson*, 435 Md. 62, 78 (2013). The 1976 General Assembly may have been on notice that the Court of Appeals had recognized absolute judicial immunity. *See Roth v. Schupp*, 94 Md. 55, 59 (1901). Legislators presumably would have known of the doctrine of qualified public-official immunity, but they also would have understood that the Court of Appeals had not yet decided the extent to which agency officials might be entitled to absolute immunity. *See Eliason v. Funk*, 233 Md. 351, 356-57 (1964). It would be unrealistic to presume that the 1976 legislature would foresee future developments in the common law, such as *Butz v. Economou*, 438 U.S. 478 (1978), and the Court of Appeals' later adoption of the functional approach to absolute immunity. Given the uncertain scope of immunity law in 1976, it would have been perfectly rational to enact either a floor on the immunity of Board personnel (as suggested by the defendants) or a ceiling on their immunity (as suggested by the Geiers). This uncertainty persisted at the time of all subsequent amendments, because the Court of Appeals still has never expressly adopted the holding of *Butz v. Economou*, much less applied it to the Board.

One principle of statutory interpretation, however, points decisively toward the defendants' interpretation of the statute. Where the legislature leaves its intention unknown or unclear, Maryland courts presume that the legislature did not intend to preempt the common law. *See WSC/2005 LLC v. Trio Ventures Assocs.*, 460 Md. 244,

86

258 (2018) (stating that the Court of Appeals has "required a strong pronouncement from the Legislature as evidence of an intention" to abrogate the common law); *Nickens v. Mount Vernon Realty Grp., LLC*, 429 Md. 53, 74 (2012) ("to abolish a right available through the common law, the statutory language must indicate an express abrogation or an abrogation by implication by adoption of a statutory scheme that is so clearly contrary to the common law right that the two cannot occupy the same space"); *Cosby v. Dep't of Human Res.*, 425 Md. 629, 645 (2012) ("it is not to be presumed that the [L]egislature . . . intended to make any alteration in the common law other than what has been specified and plainly pronounced") (citation and quotation marks omitted); *Shenker v. Laureate Educ., Inc.*, 411 Md. 317, 339 (2009) ("statutes are not presumed to make alterations in the common law other than as may be declared expressly").

This default presumption is particularly sensible when construing an immunity statute, which by its nature tends to restrict liability, not to expand it. *E.g. Williams v. Mayor & Council of Baltimore*, 359 Md. 101, 134 (2000) (concluding that statute granting a law enforcement officer immunity when acting reasonably and in good faith when responding to request to assist victim of domestic violence did not diminish the qualified immunity otherwise granted to the officer by common law). As the defendants point out, it is not uncommon for Maryland government officials and employees to enjoy multiple layers of immunity from both common-law and statutory sources, each with its own criteria and purpose, one or more of which might apply to an official's action.

"Common law public official immunity applies to 'public officials (as opposed to mere employees) who perform negligent acts during the course of their discretionary (as

87

opposed to ministerial) duties.'" *Cooper v. Rodriguez*, 443 Md. 680, 713 (2015) (footnote omitted) (quoting *Houghton v. Forrest*, 412 Md. at 585). The General Assembly has codified public official immunity, with respect to officials of municipal corporations, but has not limited its scope. *See Livesay v. Baltimore County*, 384 Md. 1, 12 (2004). "In addition to the common law qualified immunity," local government employees "enjoy an *indirect* statutory qualified immunity" under the Local Government Tort Claims Act for acts within the scope of employment. *Smith v. Danielczyk*, 400 Md. 98, 129 (2007). The immunity granted to "State personnel" under the Maryland Tort Claims Act broadly insulates certain state employees from suits for torts of any kind committed within the scope of employment and without malice or gross negligence. *See Lee v. Cline*, 384 Md. 245, 261 (2004). Finally, as discussed previously, some officials may be entitled to absolute immunity under common law to the extent that they perform legislative, judicial, or prosecutorial functions. There is no inherent conflict in carrying two or more overlapping shields.

The Geiers have pointed out that legislative intent to displace the common law need not be express, but can be determined by implication. Statutory abrogation of the common law by implication "is highly disfavored," but it can occur "if a new enactment repeals and replaces the entirety of the prior law on a comprehensive basis[,]" a phenomenon known as field preemption; or "when the new legislation has a clear incompatibility and disharmony with the common law, such that both the common law and the statutes cannot coexist[,]" known as conflict preemption. *WSC/2005 LLC v. Trio Ventures Assocs.*, 460 Md. at 258-59. At different times, the Geiers have relied on one or

88

both of those theories.

The Geiers have argued that § 5-715(b) of the Courts and Judicial Proceedings Article is in conflict with the common-law doctrine of absolute quasi-judicial immunity, at least as applied to the Board. They argue that any holding that Board personnel have absolute immunity "would render the statutory qualified immunity superfluous." Yet the scope of the statute and common-law doctrine are not identical. "Without clear incompatibility or disharmony between the common law and the statute, conflict preemption does not apply." *WSC/2005 LLC v. Trio Ventures Assocs.*, 460 Md. at 259.

As the defendants have pointed out, the statute reaches a range of activities that is broader than the functions protected by the doctrine of absolute quasi-judicial immunity. For instance, courts have held that staff members have no absolute immunity for purely investigative activity. *See Beck v. Texas State Bd. of Dental Exam'rs*, 204 F.3d 629, 637-38 (5th Cir. 2000). Absolute immunity does not reach every act of a prosecutor in the course of prosecuting a disciplinary complaint, but only those acts that are closely related to the judicial phase of the process. *See Pfeiffer v. Hartford Fire Ins. Co.*, 929 F.2d 1484, 1492-93 (10th Cir. 1991). Courts have held that agency officials have no absolute immunity for ministerial acts in connection with disciplinary proceedings. *See Olsen v. Idaho State Bd. of Medicine*, 363 F.3d 916, 928 (9th Cir. 2004). Even Board members presiding over a formal disciplinary hearing would lack absolute immunity for an action that far exceeded the Board's jurisdiction. Moreover, although the allegations of this case concern functions governed by a comprehensive set of procedural safeguards, not every possible act taken by a Board member or agent would satisfy that requirement. For

89

these and other actions within the language of the statute but outside the scope of the common-law doctrine, the statute protects the defendant from ultimate liability for damages unless the plaintiff proves malice.

In the circuit court, the Geiers argued that the immunity statute was meant to "occupy the entirety of the subject matter at issue." In our judgment, however, neither the original immunity law nor its subsequent amendments are candidates for field preemption. The original 1976 act was anything but comprehensive. It accomplished two discrete purposes: restricting the admissibility of certain records and shielding certain persons from civil liability under certain conditions. 1976 Md. Laws ch. 601, preamble. If that legislation could be seen as impliedly occupying an entire field, then virtually every statute in the Maryland Code granting an immunity would have the same effect. By contrast, the 1990 act did address an entire subject matter on a comprehensive basis. In that instance, however, the General Assembly expressly disclaimed any intent to displace the common law. The act expressly stated that its provisions were "intended only to consolidate the current provisions on immunities, limitations on liability, and other prohibited actions in the Annotated Code of Maryland and to make stylistic changes," and that there was "no intent to alter substantively any statutory or common-law immunities, limitations on liability, or prohibited actions." 1990 Md. Laws ch. 546, § 4.

Although it is certainly possible that in 1976 the General Assembly may have intended to restrict Board personnel from claiming anything greater than a qualified immunity, any such intention is neither expressly stated nor clearly implied. In light of

that uncertainty, we construe § 5-715(b) of the Courts and Judicial Proceedings Article as adding an additional statutory immunity that neither changes nor limits other defenses that might be available at common law.

## IV.  Absolute Immunity in the Procedural Context of this Case

The appellate briefs here mostly address whether the defendants are "entitled" to absolute immunity in an abstract sense.  Normally, this Court does not directly review whether a party is "entitled" to a favorable judgment; our role is to review whether the circuit court committed errors affecting the judgment.  The apt question here is whether the circuit court erred in denying the dispositive motions in which the defendants relied on absolute immunity.  The record shows that the court erred at those critical junctures.

### A.  Denials of Motion to Dismiss and Motion for Summary Judgment

"From a procedural standpoint the absolute immunity asserted in this case is a defense of failure to state a claim upon which relief can be granted."  *Mandel v. O'Hara*, 320 Md. 103, 134 (1990).  This type of defense may be raised by a preliminary motion to dismiss under Md. Rule 2-322(b)(2), in any pleading, or in a motion for summary judgment.  *See* Md. Rule 2-324(a).  Such a defense must "be determined before trial on application of any party, except that the court may defer the determination . . . until the trial."  Md. Rule 2-323(b).  This defense "is not waived, even if first made at trial on the merits."  *Mandel v. O'Hara*, 320 Md. at 134 (citing Md. Rule 2-324).

The Court of Appeals' recent cases on absolute immunity have arisen under two main procedural scenarios.  In some cases, plaintiffs have appealed from a final judgment resulting from an order dismissing an action or granting summary judgment in favor of

91

the defendant. *D'Aoust v. Diamond*, 424 Md. 549, 568-69 (2012); *Gill v. Ripley*, 352 Md. 754, 759 (1999); *Parker v. State*, 337 Md. 271, 275-76 (1995). In other cases, defendants have appealed, under the collateral order doctrine, from interlocutory orders denying a claim of immunity. *See Keller-Bee v. State*, 448 Md. 300, 304 & n.2 (2016); *Mandel v. O'Hara*, 320 Md. at 107, 134.

The agency officials in this case were ineligible to take an appeal from the denial of immunity under the collateral order doctrine. *Maryland Bd. of Physicians v. Geier* ("*Geier II*"), 451 Md. 526, 556-57 (2017) (applying *Dawkins v. Baltimore City Police Dep't*, 376 Md. 53, 65 (2003)). Of course, that holding does not deny appellate review; it merely delays it. An interlocutory order overruling a claim of absolute immunity is "reviewable on appeal from an adverse final judgment." *Washington Suburban Sanitary Comm'n v. Bowen*, 410 Md. 287, 301 (2009). "If valid," the claim of immunity "will result in a reversal of the judgment and a direction to dismiss the action." *Id.*

The defendants here first asserted their absolute immunity in a preliminary motion to dismiss. On review of the denial of a motion to dismiss, an appellate court determines whether the trial court's decision was legally correct. *See, e.g.*, *State Ctr., LLC v. Lexington Charles Ltd. P'ship*, 438 Md. 451, 509 (2014). A motion to dismiss should be granted where the plaintiff would not be entitled to relief even if all allegations in the complaint and all reasonable inferences drawn from those allegations are true. *Id*. The defendants' argument on absolute immunity, albeit concise, was sufficient to carry their burden on the motion to dismiss all claims against all defendants.

When the circuit court denied that motion, the court said that it did not think that it

92

had "an adequate record" to decide whether any immunity might apply.  The court's rationale is wholly appropriate for deferring a decision on an immunity that requires the absence of malice (*see Artis v. Cyphers*, 100 Md. App. 633, 653, *aff'd mem.*, 336 Md. 561 (1994)), but it has little bearing on an issue of absolute immunity.  When a court decides whether an absolute immunity applies, its decision is ordinarily "unaffected by the particular facts which might be developed" in discovery or at trial.  *Mandel v. O'Hara*, 320 Md. at 134.  Indeed, one main reason for affording absolute immunity is to protect officials "from the annoyance of suit itself" and so that they "'can perform their . . . functions without harassment or intimidation[.]'"  *Gersh v. Ambrose*, 291 Md. 188, 192 (1981) (quoting *Butz v. Economou*, 438 Md. 478, 512 (1978)).

In denying the motion to dismiss, the court appeared to conclude that it could not evaluate the issue of absolute immunity without a factual record about procedures used by the Board.  This reasoning was flawed.  "'[I]t is the available procedures, not the manner in which they are exercised in a particular case, that is the critical inquiry for determining whether there are safeguards that reduce the need for private damages actions.'"  *Olsen v. Idaho State Bd. of Medicine*, 363 F.3d 916, 925 (9th Cir. 2004) (quoting *Mishler v. Clift*, 191 F.3d 998, 1006 (9th Cir. 1999)).  The defendants met their burden on this sub-issue by citing *Ostrzenski v. Seigel* for its analysis of safeguards available under the Medical Practice Act and by explaining that the Board's regulations afforded Dr. Geier the right to challenge the cease-and-desist order in an evidentiary hearing and to seek judicial review under the Administrative Procedure Act.  No further factual development was needed regarding these statutes or regulations.

93

During the hearing on the defendants' motion to dismiss, the court also suggested that the issue of absolute immunity might turn on facts regarding the posting of the order on the Board's website, as opposed to the decision to issue the order as a public document. This reasoning was also flawed. The function for which the defendants asserted immunity, the Board's decision to issue the public order, was "essential to any injury complained of by the [Geiers], as well as to any computation of damages." *Mandel v. O'Hara*, 320 Md. at 128. "*Once a document is made public*, Maryland law does not limit who, where, or the extent to which one may view that document." *Norman v. Borison*, 418 Md. 630, 664 (2011) (emphasis in original). Because the issuance of the order was "the operative act" that caused the Geiers' injuries, "it matters not" that the Geiers might try to refocus their allegations on the posting of the order on the website. *Keller-Bee v. State*, 448 Md. at 310.

The denial of the motion to dismiss cleared the way for the discovery disputes chronicled in the two interlocutory appellate opinions reversing some of the court's discovery rulings. Between those two decisions, the court revisited the issue of absolute immunity when it denied the motion for summary judgment. The defendants offered no evidentiary exhibits in support of the motion, but instead they relied solely on legal authorities. The Geiers' response did not identify any factual disputes material to the issue of absolute immunity, as required when a party opposes a motion for summary judgment based on a factual dispute. *See* Md. Rule 2-501(b). The Geiers responded on

the merits to the argument that defendants were entitled to judgment as a matter of law.[26]

Just as the parties did, the court treated the issue as a matter of law involving the application of statutes, regulations, and case law. Although a trial court sometimes has discretion to defer a decision on a summary judgment motion, a case involving absolute immunity "is not one within the discretion which a trial court ordinarily has to deny summary judgment." *Mandel v. O'Hara*, 320 Md. at 134. Moreover, the court here "did not exercise discretion to deny the [motion] until there was a complete factual record, but rather only answered a pure legal question." *Amalgamated Transit Union v. Lovelace*, 441 Md. 560, 565 n.4 (2015). Accordingly, we review the summary judgment decision without deference. *Id.*

During the summary judgment hearing, the circuit court declined to consider *Ostrzenski v. Seigel*, 177 F.3d 245 (4th Cir. 1999), which the defendants used to show an application of the doctrine of absolute quasi-judicial immunity to the Board's proceedings. The court said that it was "not interested in what the US Court of Appeals for the Fourth Circuit said," because only the Court of Appeals and the United States Supreme Court "have the power to review" the decision. Although it is true that decisions of the federal courts of appeal are not binding on courts of this State, the court appeared not to consider whether the precedent had value as persuasive authority (*see*

---

[26] In a footnote, the Geiers asserted that further disclosures were still "vital" because their discovery requests were "tailored to uncovering the procedures involved in issuing the cease and desist order (which would affect [the defendants'] claim to absolute immunity)[.]" In reality, their discovery requests were immaterial to the issue of absolute immunity. Information about all of the relevant procedures was published in the Maryland Code and the Code of Maryland Regulations.

95

*Gayety Books, Inc. v. City of Baltimore*, 279 Md. 206, 213 (1977)) and instead rejected it altogether.

Heeding the unwarranted restriction on their argument, counsel for the defendants then shifted focus to *Butz v. Economou*, 438 U.S. 478 (1978), a binding authority on immunity from the § 1983 claim and potentially a persuasive authority on immunity from the Maryland tort claim. Yet the circuit court quickly retorted that "*Butz* has no relevance legally" because it involved a different factual situation. As explained earlier, *Butz v. Economou*, 438 U.S. at 514-15, establishes absolute immunity for persons "performing adjudicatory functions" and "functions analogous to those of a prosecutor" in certain administrative proceedings. Those principles apply broadly to claims arising from proceedings of state agencies, including medical boards. *See, e.g.*, *Ostrzenski v. Seigel*, 177 F.3d at 249.

At the hearing, the Geiers persuaded the court that § 5-715 of the Courts and Judicial Proceedings Article preempted any principles of common law on the subject of immunity for members and agents of the Board. For the reasons explained earlier, we disagree with that interpretation of the immunity statute. Moreover, to the extent that the court may have treated the Maryland statute as controlling on the federal claim, the court erred. As the Geiers had rightly conceded in their memorandum in opposition to the summary judgment motion, the Maryland statute has no bearing on the defendants' immunity to the § 1983 claim. *See Martinez v. California*, 444 U.S. 277, 284 (1980).

The court, in denying the motions for dismissal and for summary judgment, twice rejected a valid assertion of absolute immunity for invalid reasons. "[R]eversal of the

judgment and a direction to dismiss the action" (*Washington Suburban Sanitary Comm'n v. Bowen*, 410 Md. at 301) is the usual appellate remedy for such an error.

## B.      Refusal to Consider Absolute Immunity After Default as to Liability

After rejecting the merits of the claim of absolute immunity, the court later supplied a procedural explanation for refusing to recognize any immunity. In its post-trial opinion, the court said that it would "not consider" any immunity defense in light of its decision to order a default as to the liability of all defendants. Invoking general principles regarding default judgments, the Geiers argue that it was proper for the court to "discontinue its consideration" of immunity once it ordered the default as to liability.[27]

Neither party has pointed to any authority (from Maryland or elsewhere) addressing the interplay between an absolute immunity from suit and a default as to liability. These concepts seem impossible to reconcile. Generally, immunity "allows a defendant to 'avoid[ ] liability in tort under all circumstances, . . . and it does not deny the tort, but the resulting liability." *D'Aoust v. Diamond*, 424 Md. 549, 584-85 (2012) (quoting William L. Prosser, *Handbook of the Law of Torts* ch. 126, at 970 (4th ed. 1971)). Under Maryland law, however, a default "should be treated as an admission of liability" once imposed. *Porter Hayden Co. v. Bullinger*, 350 Md. 452, 472 (1998). The Court of Appeals has said that an appellate court "cannot go behind the judgment by default to examine into and determine upon the validity of the cause of action upon which

---

[27] It is inaccurate to say that the court "discontinue[d] its consideration" of the defendants' immunity after the default order. Even after the court had already imposed that sanction, the court gave full consideration to the merits of the absolute immunity issue when it decided their summary judgment motion.

suit is instituted[.]" *Millison v. Ades of Lexington, Inc.*, 262 Md. 319, 328 (1971).

The Geiers criticize the defendants for failing to address the circuit court's theory that the default as to their liability overrides their absolute immunity. The defendants have, however, waged a thorough challenge to the default decision itself. A decision to impose a judgment by default as a discovery sanction will be reversed if the trial court abused its discretion. *See, e.g.*, *Lakewood Eng'g & Mfg. Co., Inc. v. Quinn*, 91 Md. App. 375, 388 (1992). In reviewing a decision to impose discovery sanctions, we consider only the grounds actually relied on by the trial court. *North River Ins. Co. v. Mayor & City Council of Baltimore*, 343 Md. 34, 47-48 (1996).

The defendants argue that most of the alleged discovery failures concerned privileged information. They argue that any discovery failures were not severe enough or prejudicial enough to justify the ultimate sanction of a default. Finally, they argue the court abused its discretion by sanctioning the individual defendants for discovery failures attributable to the Board.

Their final argument, undeniably, has merit. The record shows that the circuit court decided to impose the default as to liability after four motions for sanctions. Although the Geiers' initially complained to the court about inadequate responses to certain discovery requests directed at all defendants, the decision to impose the sanction of default resulted from specific findings of discovery failures by the Board alone.

At the outset of discovery in August of 2013, the Geiers made sweeping discovery requests directed at all defendants but seeking an individualized response from each defendant. The court rendered an oral ruling in late November of 2013, compelling each

of them to answer interrogatories and to produce documents. The Geiers first moved for sanctions in early January of 2014, upon being informed by opposing counsel that the Board had belatedly identified "approximately 14 boxes" of documents containing "material about the Mark and David Geier cases." On that basis, the Geiers requested "the entry of default against the Defendants[.]" At the hearing on that motion, the defendants pointed out that the motion "attempted to implicate 26 different defendants," even though the Board itself had "possession and control" of the documents in question. The court granted the motion based on "the magnitude and timing of the nonproduction until January of 2014," but the court did not determine the sanction at that time.

The next major discovery contest, throughout 2014, concerned the Board's files from its disciplinary proceedings against Dr. Geier's medical partner, Dr. Young. The court issued an order compelling the disclosure of those files, which prompted the defendants to appeal from that order. The Board failed to comply with that order while it was awaiting a ruling from this Court on a motion to stay discovery. On that basis, the Geiers moved for immediate sanctions "including the entry of default judgment against the Defendants[.]" In response, the defendants argued that "it would be inappropriate" for the court to impose sanctions against any defendants who had "no means of requiring" the production of those files. The court initially granted unspecified sanctions, but later vacated that aspect of its decision after this Court reversed the underlying order

compelling the disclosure of the Board's files on Dr. Young.[28]

In mid-2014, the Geiers also served notice for an organizational deposition of the Board under Md. Rule 2-412(d). The deposition notice directed the Board to designate one or more representatives to testify on the Board's behalf about 167 proposed topics. A few days before the scheduled deposition, the Board moved for a protective order on the ground that its designee was unavailable, but did not obtain a ruling before the deposition was to begin. The Board's designee failed to appear without first obtaining a protective order. When the Geiers moved for immediate sanctions "against the Defendants[,]" the defendants noted that the court had "no basis . . . to sanction individual Defendants for the organizational deposition of a separate party." In reply, the Geiers disclaimed the suggestion that they were seeking sanctions against any defendant other than the Board for the nonappearance of the Board's designee. The court declined to issue a protective order based on the unavailability of the Board's designee and granted the Geiers' motion for sanctions.

The Board's designee appeared for a rescheduled deposition, but proved unable to answer questions about the majority of the numerous topics listed on the deposition notice. In yet another motion for sanctions, the Geiers requested "the entry of a default judgment against the [Board]"[29] based on its "failure to provide a knowledgeable

---

[28] The Geiers also filed (but later withdrew) a motion seeking sanctions against opposing counsel, the Board, and three individual defendants, for failing to answer questions about Dr. Young's case during the depositions of those defendants.

[29] This motion for sanctions, the fifth, used the acronym "MBOP" to refer to the Maryland Board of Physicians. The introduction and conclusion requested "the entry of

100

organizational representative" for the deposition. At a hearing solely on that motion, the court concluded that "the circumstances surrounding the . . . depositions of the organizational representative are unfortunately of a piece with the [B]oard's conduct in discovery." The court announced that it would grant the motion and take the sanction under advisement.

One month later, the court supplemented its bench rulings with a written opinion. The court recounted that "deadlines in this case ha[d] been moved repeatedly because of discovery problems, due to the conduct of the Board and its inability, or in some cases outright refusal, to produce documents or accurate privilege logs in a timely fashion." The court found that the Board's designee "was unable to testify on 90 of the [167] topics listed in the deposition notice, undertook no meaningful investigation, and was unfamiliar with the facts bearing on the gravamen of this lawsuit." The court concluded that "the Board failed to make a good faith effort to find out the relevant facts or to interview witnesses with knowledge in preparation for its organizational deposition[,]" and that "the Board's failure" in this regard "was willful, intentional[,] and in bad faith." The court saw "no justifying excuse for the Board's latest discovery violation[,]" which "occurred after numerous hearings and orders compelling the Board, with limited success to answer discovery."

Yet even though the court made exhaustive findings about discovery failures by

---

default judgment against the MBOP." The Geiers' reply in support of their motion specified that they were asking the court to "enter a default judgment against the MBOP as a sanction for its comprehensive failure to cooperate in discovery."

the Board, the court ordered a default as to liability of "the defendants[.]"  The

defendants argue that this sanction was unauthorized by rules and forbidden by case law.

Maryland's discovery rules permit a discovering party to move for immediate

sanctions based on certain total failures of discovery, such as the failure to appear for a

deposition or the failure to serve a response to interrogatories or to a request for

production.  *See* Md. Rule 2-432(a).  On a motion for immediate sanctions, "the court, if

it finds a failure of discovery, may enter such orders in regard to the failure as are just,"

including orders imposing one or more specified sanctions.  Md. Rule 2-433(a).  For

other discovery failures (such as an inadequate response to a question asked in a

deposition, to an interrogatory, or to a request for production), the discovering party must

move for and obtain an order compelling discovery under Rule 2-432(b) before seeking

any sanctions.  *See Butler v. S&S P'ship*, 435 Md. 635, 657-58 (2013).  On motion, the

court may impose sanctions against a person who fails to obey an order compelling

discovery.  Md. Rule 2-433(c).  The most severe sanction to impose for a defendant's

discovery failure is an order "entering a judgment by default that includes a

determination as to liability and all relief sought by the moving party *against the failing

party*[.]"  Md. Rule 2-433(a)(3) (emphasis added).

What is implicit in these rules is made explicit in this Court's opinions: "discovery

sanctions apply only to the parties involved in the discovery violation."  *Warehime v.

Dell*, 124 Md. App. 31, 58 (1998).  In other words, "'discovery sanctions against one

party should not adversely affect another who has not participated in the discovery

proceedings.'"  *Hossainkhail v. Gebrehiwot*, 143 Md. App. 716, 731 (2002) (quoting

*Heineman v. Bright*, 124 Md. App. 1, 12 (1998)).  The decision to impose sanctions

based on a defendant's discovery failure does not justify the imposition of sanctions

against a co-defendant.  *See Heineman v. Bright*, 124 Md. App. at 12-13 (holding that,

where the court precluded one defendant from calling witnesses as sanction for failure to

answer interrogatories, the court could not preclude a co-defendant from calling

witnesses).

This holding follows from the wording of the Rules and from common sense.  The

"failing party" within the meaning of Rule 2-433 is the party responsible for the

discovery failure, not the parties who might benefit from the failure.  *Cf. Warehime v.*

*Dell*, 124 Md. App. at 54-55 (rejecting a construction of "the phase 'discovering party'"

in Rules 2-432 and 2-433 "to encompass every co-party who had an identity of interest in

the fruit" of the discovery request).  A court should not sanction a party at all, let alone

impose the harshest sanction available, for that party's "failure" to produce something in

the exclusive possession and control of some other party.  Similarly, an organization's

failure to meet its obligations as a deponent, standing alone, does not justify the

imposition of sanctions against persons employed by that organization.  The Geiers do

not specifically address the defendants' argument that discovery sanctions under the

Maryland Rules are "party-specific."

The Geiers nonetheless argue that the Board's discovery failures are "imputable"

to each of the 25 individual defendants because they shared representation with the Board

through the Attorney General's office.  The Geiers, however, cite no authority endorsing

the use of discovery sanctions as collective punishment.  Moreover, Maryland cases point

in the opposite direction. *See Berrain v. Katzen*, 331 Md. 693, 710-11 (1993) (holding that trial court abused its discretion by dismissing claims of minor plaintiffs based on discovery failures of next friend who sued on behalf of minor plaintiffs); *Hart v. Miller*, 65 Md. App. 620, 628 (1985) (holding that trial court abused its discretion in dismissing plaintiff's action even though "[s]ome sanction as to [plaintiff's] counsel was appropriate"); *see also Station Maint. Solutions, Inc. v. Two Farms, Inc.*, 209 Md. App. 464, 487-88 (2013) (holding that trial court lacks authority to impose sanction on party for violation of a scheduling order based solely on conduct of that party's insurer).

In any event, the record fails to show that the court adopted the Geiers' imputability theory. Our review of the imposition of a discovery sanction "does not involve a search of the record for grounds, not relied upon by the trial court," which might "support the trial court's action." *North River Ins. Co. v. Mayor & City Council of Baltimore*, 343 Md. at 47-48. In the context of reviewing a discovery sanction, the "exercise of discretion must be clear from the record." *Scully v. Tauber*, 138 Md. App. 423, 431 (2001). Even the Geiers admit that "it is not clear from the record the extent to which the [c]ourt attributed the Board's deposition discovery failures to the individual [d]efendants, if at all." The court here occasionally made vague references to conduct of the "defendants," but the court made no clear finding that some or all of the other 25 defendants were directly or indirectly responsible for a specific discovery failure which merited the ultimate sanction of a default.

The record shows that the court sanctioned all defendants: because the Board disclosed the existence of thousands of pages of documents months after the court

104

ordered the production of documents; because the Board failed to comply with an order (later reversed on appeal) compelling it to produce its files on Dr. Young; because the Board's designee failed to appear for a deposition without first obtaining a protective order; and because the Board's designee was not adequately prepared to testify about most of the topics from the deposition notice. At most, the court's findings supported the imposition of judgment by default as to liability of the Board as "the failing party" under Rule 2-433(a)(3).

As soon as the case returned to the circuit court after the interlocutory appeal, the defendants moved to vacate the order of default. In their motion, they explained how the court's decision to sanction each of the 25 individual defendants for discovery failures of the Board ran afoul of case law interpreting the Maryland discovery rules. The court nevertheless refused to reconsider that aspect of its sanction.

At the motions hearing, the court said that, "assuming without deciding [that] it was error" to impose the sanction on those defendants, the court did not "recall" that they had "preserved" that particular argument. Counsel for the Geiers then told the court that the defendants had never argued that the court should not sanction them for the Board's discovery failures and that the Geiers' motion for sanctions based on the Board's deposition failures had requested a default judgment against all defendants.

The court's recollection was incomplete, and counsel's representations were incorrect. When opposing motions that specifically requested sanctions against all defendants, the defendants consistently argued that the court should not sanction the 25 individuals based on the Board's failures. After those repeated objections, the Geiers

105

narrowed their request for sanctions regarding the Board's deposition to the Board alone.

The court's refusal to vacate the default as to the 25 individual defendants rested on the clearly erroneous finding that those defendants had never objected to being sanctioned for the Board's discovery failures. The ruling must be reversed. *See North River Ins. Co. v. Mayor & City Council of Baltimore*, 343 Md. at 62-63; *Scully v. Tauber*, 138 Md. App. at 430-32.

After the trial on damages, the court offered a new rationale for deeming the defendants in default as to liability. The court found that defendants either failed to preserve or failed to disclose electronic data of email communications which the Geiers might have used to show malice. The court said that "any sanction less than a default as to liability" would not remedy the prejudice resulting from the "intentional spoliation of manifestly relevant electronic information." The court explained:

> The plaintiffs had been seeking copies of e-mails among Board members and staff since the inception of the case. The simple reason the plaintiffs sought this information was to obtain evidence to show the defendants' motivation behind publishing their private medical information on the internet. In short, the plaintiffs were looking for evidence of actual malice. The court finds that the plaintiffs' entire discovery plan centered on this critical issue. What the defendants did was never in dispute. Why they did it, however, is at the heart of this case.

We are unpersuaded by the Geiers' suggestion that this post-trial sanction decision is "sufficient to vitiate any error that may have occurred" in the initial default order. To the contrary, the second decision compounded the effect of earlier errors. The determinations that the defendants lacked absolute immunity understandably affected the court's evaluation of the defendants' disclosure obligations, which became an essential

106

premise of the decision to grant the final motion for sanctions.

First, the court should have granted the preliminary motion to dismiss on the ground of absolute immunity. Next, the court never should have ordered a default as to the liability of any defendant other than the Board, and thus should not have refused to consider their absolute immunity defense. Later, when the defendants moved to vacate the default, the court should have set aside the default, at least as to the 25 individual defendants, and granted their motion for summary judgment motion on the ground of absolute immunity. The rejection of absolute immunity also resulted in the denial of a motion for a protective order, which would have relieved the defendants of further discovery obligations. Under the circumstances, the individual defendants did more than enough to preserve absolute immunity as a ground for reversal on appeal.

The conclusion that all Board personnel were entitled to absolute immunity negates any basis for a judgment against the Board or the State based on the actions of the Board personnel. *See Parker v. State*, 337 Md. 271, 286 (1995). Further, a judgment in favor of all Board personnel inures to the benefit of the Board regardless of whether the Board was in default.

Under Maryland law, "where a common basis of liability had been alleged against two defendants, . . . a finding in favor of the non-defaulting defendant that the common basis of liability is not proven inures to the benefit of the defaulting defendant." *Curry v. Hillcrest Clinic, Inc.*, 337 Md. 412, 415 (1995). The purpose of this doctrine is to avoid the "'incongruity'" or "'absurdity'" of a judgment against a defaulting defendant which contradicts a judgment in favor of a non-defaulting defendant. *Id.* at 429 (quoting *Frow*

107

*v. De La Vega*, 82 U.S. (15 Wall.) 552, 554 (1872)).  No judgment can be entered against a defaulting defendant if a judgment in favor of a non-defaulting defendant logically precludes the liability of the defaulting defendant.  *Curry v. Hillcrest, Inc.*, 337 Md. at 430.  Thus, where the defaulting defendant is an employer and the sole basis for the employer's liability is the conduct of its employees, the employer benefits from a judgment in favor of the employees.  *Id.*  Here, it would be "an error of law" (*id.* at 435) to refuse to set aside the order of default as to the Board and to give the Board the benefit of the judgment in favor of its personnel.

Of course, it would be unjust to permit the Board to benefit from the immunity of its personnel if the Board wrongfully withheld information that the Geiers might have used to overcome that immunity.  Yet none of the information that the Geiers sought to discover from the Board was material to the issue of absolute immunity.  If the Board had given the Geiers all of the information that they sought, the Geiers might have learned more about the roles that particular defendants played in the Board's decisions and the motives of individual actors.  But discovery would not have altered the dispositive fact: the Geiers were seeking to recover damages resulting from protected functions that do not give rise to civil liability.  That fact was established by the complaint on its face and remained unchanged during every subsequent stage of the case.

### CONCLUSION

All defendants are entitled to judgment in their favor as to all claims.

No basis exists for any judgment against the Board under 42 U.S.C. § 1983, because the Geiers did not raise any § 1983 claim against the Board and because the

Board is not a "person" that can be held liable for damages under § 1983. All of the individual defendants who were sued under § 1983 have absolute immunity under federal law because they performed adjudicative or prosecutorial functions and the applicable provisions of State law afforded adequate procedural safeguards to restrain unconstitutional conduct by agency officials. Because the Geiers are not prevailing parties on their § 1983 claim, they are not entitled to attorneys' fees under 42 U.S.C. § 1988.

Under Maryland common law, the 25 individual defendants also have absolute immunity from the tort claim against them because they performed adjudicative or prosecutorial functions and the applicable provisions of State law afforded adequate procedural safeguards to restrain unlawful conduct by agency officials. The circuit court's order imposing a default as to the liability of those defendants must be set aside, because the court lacked authority to impose that sanction against them based on discovery failures of the Board. Even if the court's findings justified the default as to the liability of the Board, the Board necessarily benefits from the judgment in favor of all Board personnel.

We agree with the circuit court's observation that the State Board of Physicians "is a serious public trust." The justification for the outcome in this case is that requiring officials to risk multi-million-dollar lawsuits and to subject their motives to the appraisal of a factfinder would do more to undermine the public trust than to enhance it. Anything less than an absolute immunity would subject "all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome," which would

109

deter all of them from "the unflinching discharge of their duties." *Mandel v. O'Hara*,

320 Md. 103, 115 (1990) (citations and quotation marks omitted).

> **JUDGMENT OF THE CIRCUIT COURT FOR MONGTOMERY COUNTY REVERSED. CASE REMANDED TO THAT COURT FOR THE ENTRY OF JUDGMENT IN FAVOR OF DEFENDANTS AS TO ALL CLAIMS. COSTS TO BE PAID BY APPELLEES.**

# APPENDIX

The "Brief of the Individual Appellants" presents the following 11 questions:

1. Are defendants entitled to absolute quasi-judicial immunity because the Geiers' claims are based entirely on actions taken in ongoing physician-disciplinary proceedings in which the Board of Physicians was performing a discretionary quasi-judicial function?

2. Were defendants denied due process of law, and did the court abuse its discretion in entering a default judgment based on non-prejudicial failures of discovery by the Board?

3. Was the court arbitrary and did it deny defendants due process in refusing to enforce their subpoena for audio-recordings of relevant Board meetings and precluding them from offering evidence on lack of malice, while permitting plaintiffs to adduce evidence on that subject matter?

4. Was the court clearly erroneous in finding malice and awarding punitive damages, where there was no evidence of actual malice, and the court based its findings on adverse inferences drawn from the Board's assertion of deliberative privilege and alleged spoliation of emails?

5. Are defendants entitled to qualified immunity under § 1983, where non-Board and non-voting members did not disclose information, and it is not clearly established that publication violated plaintiffs' constitutional right to privacy?

6. Where plaintiffs failed to establish malice or gross negligence, are defendants entitled to State personnel immunity from plaintiffs' common-law claims?

7. Were defendants entitled to a jury trial on damages?

8. Did the court err in amending the judgment to find that Dr. Ramakrishna acted with malice, based on an ex parte communication?

9. Is the award of attorneys' fees excessive, given that the court nearly tripled the hourly rate that plaintiffs' lead attorney billed?

10. Does a claim for invasion of privacy survive death?

11. Did the judge abandon his neutral role by demonstrating ongoing partiality for plaintiffs and hostility toward defendants throughout the proceedings?

The "Brief of Appellant Maryland Board of Physicians" presents the following seven questions:

1. Is the Maryland Board of Physicians entitled to absolute quasi-judicial immunity from suit and discovery, because in issuing a cease-and-desist order in ongoing physician disciplinary proceeding, the Board was performing a discretionary quasi-judicial function?

2. Did the circuit court err and abuse its discretion in entering a default judgment on liability as a sanction for the performance of the Board's representative at a deposition, where plaintiffs noticed 167 topics and the plaintiffs' chief complaint was that the representative did not provide information that the appellate courts later ruled was non-discoverable?

3. Did the court err in entering judgment against the State for damages, attorneys' fees, and costs for claims under 42 U.S. § 1983, where the State is not a "person" under § 1983, and the State has Eleventh Amendment immunity?

4. Were the defendants entitled to a jury trial on damages?

5. Is the award of attorneys' fees excessive, given that the court nearly tripled the hourly rate that the plaintiffs' lead attorney billed to plaintiffs?

6. Does a claim for invasion of privacy survive a plaintiff's death?

7. Did the judge abandon his neutral role by demonstrating ongoing partiality for plaintiffs and hostility toward defendants throughout the proceedings?